CITY OF WEST ALLIS, Respondent, v. RAINEY, Appellant.

*October 4—October 31, 1967.*

For the appellant there was a brief by *Robert J. Beaudry* and *Richard D. Kaestner,* and oral argument by *Alyce Tallman Neff,* all of Milwaukee.

For the respondent there was a brief by *William T. Schmid,* city attorney, and *Frederick A. Miller,* assistant city attorney, attorneys, and *Frank X. Koelsch III* of West Allis of counsel, and oral argument by *Mr. Koelsch.*

WILKIE, J.   The single and narrow issue raised by this appeal is whether or not the trial court committed prejudicial error when it permitted Officer Marlewski to testify that the breathalyzer reading was .19 of one percent blood alcohol by weight.

No objection was made in the trial court, or has been raised on this appeal, challenging the reliability or accuracy of this breathalyzer machine, or the qualifications of this officer to give the test, or the manner in which this test was given. The sole objection is that the trial court permitted Marlewski to give the results of his reading (without first being qualified as an expert who understands and can interpret the results of that reading).

The breathalyzer was developed by Dr. Robert F. Borkenstein and was first made available to the public in 1954.[1] The machine itself is

". . . a semi-automatic console analyzer designed to give reliable results when operated by law enforcement

[1] The functioning of the machine is explained in Watts, *Some Observations on Police-Administered Tests for Intoxication,* 45 N. C. L. Rev. (1966), 34, 55–69.

officers and others with little formal scientific background. It wastes all but the last portion of a long exhalation and then traps a measured volume of that exhalation. Upon release of a gravity-activated piston, the trapped (alveolar) breath is forced through a measured volume of reagent (potassium dichromate in sulfuric acid) contained in a glass ampoule. The alcohol-sensitive reagent loses color in direct proportion to the amount of alcohol present in the breath sample. By comparing the test ampoule of reagent with an unopened ampoule, the instrument photoelectrically measures the amount of color change and automatically calculates and gives a reading of the subject's blood-alcohol percentage." [2]

Since the breathalyzer was developed, many studies of its faults and virtues have been conducted.

"One of its most interesting aspects is utilization whenever possible of the 'fail-safe' principle, so that errors caused by either mechanical defect or operator fault will usually produce low rather than high readings." [3]

Another feature of the breathalyzer is its ability to discriminate against substances other than alcohol that might react with the machine's reagent (*i.e.,* potassium dichromate).

It is unnecessary to consider the many steps followed in the actual giving of the test, either generally or by Officer Marlewski, since no challenge was made at the trial of the actual conduct of the test.

Although Marlewski is merely a high-school graduate without any chemistry background and had only performed one actual breathalyzer test prior to the testing of the defendant, he had had some training in operating the machine. Marlewski had received three days of training at the Wisconsin State Police Academy. After completing this instruction and passing a test, he was given a certificate indicating that he was a "Breathalyzer

[2] *Id.* at page 64.
[3] *Id.* at page 66.

Operator." Marlewski completed his training just eighteen days prior to the testing of the defendant. Although Marlewski's training and experience could hardly be described as extensive, it appears that he was competent as an operator and in fact no challenge was made at the trial or is made here on appeal of his qualifications to give the test.

Thus, we reach the narrow issue of whether or not Marlewski was a competent witness to testify as to the reading from the breathalyzer.

In the case of *Kuroske v. Aetna Life Ins. Co.,*[4] this court held admissible scientific evidence obtained by the use of tests to determine intoxication. This was at a time prior to the enactment of any Wisconsin statute specifically allowing the admissibility of the results of such tests.[5] Although considering such results admissible the court insisted that there must be expert witnesses to testify to give any interpretation of the results of these tests.

In 1949 the Wisconsin legislature enacted sec. 85.13 (2), Stats. This statute not only approved the use of chemical tests to determine intoxication, but also declared the weight to be given to the findings derived from the tests. Sec. 85.13 (2), Stats. 1949, inasmuch as the weight to be allocated to various percentages of alcohol is concerned, is substantially the same as our present sec. 885.235. Sec. 85.13 (2), Stats. 1949, however, was silent on the question of whether or not expert testimony was still required.

In *State v. Resler* [6] this court struck down the state's contention that the purpose of sec. 85.13 (2), Stats. 1949, was to enact into law the considered judgment of all

[4] (1940), 234 Wis. 394, 291 N. W. 384.

[5] In *Kuroske, supra,* footnote 4, at pages 403, 404, this court discussed the then recent statutory enactments in Indiana and Maine which authorized their courts to admit scientific evidence of intoxication and which declared the effect of the results of such evidence.

[6] (1952), 262 Wis. 285, 55 N. W. 2d 35.

the experts, and thus make it unnecessary to produce expert testimony.

Subsequent to *Resler* the legislature, by ch. 510, Laws of 1955, repealed sec. 85.13 (4), Stats. (the former sec. 85.13 (2), Stats. 1949) and created in its stead sec. 325.235. Sec. 325.235 (now renumbered sec. 885.235) provides that if the chemical test was performed within two hours after the event to be proved, "[s]uch chemical analysis shall be given effect as follows without requiring any expert testimony as to its effect."

This statutory language is clear and unambiguous. When confronted with language of this type, no judicial rule of construction is permitted, and the court must arrive at the intention of the legislature by giving the language its ordinary and accepted meaning.[7]

The clear meaning of this statutory language is that an expert witness is not required to interpret the results of the enumerated chemical tests in so far as their effects are concerned. Actually, the statute itself evaluates the results of the various tests.[8]

---

[7] *Id.* at page 290.

[8] *For example, see* sec. 885.235 (1), Stats., which states: "(1) In any action or proceeding in which it is material to prove that a person was under the influence of an intoxicant while operating or handling a vehicle or firearm, evidence of the amount of alcohol in such person's blood at the time in question as shown by chemical analysis of a sample of his breath, blood, urine or saliva is admissible on the issue of whether he was under the influence of an intoxicant if such sample was taken within 2 hours after the event to be proved. Such chemical analysis shall be given effect as follows without requiring any expert testimony as to its effect:

"(a) The fact that the analysis shows that there was five-hundredths of one per cent or less by weight of alcohol in the person's blood is prima facie evidence that he was not under the influence of an intoxicant;

"(b) The fact that the analysis shows that there was more than five-hundredths but less than fifteen-hundredths of one per cent by weight of alcohol in the person's blood is relevant evidence

The statute does not allow a nonexpert to explain and/or interpret the results of the enumerated chemical tests. Nor does the statute allow a nonexpert to administer the test if expertise is otherwise essential.

In the instant case, Officer Marlewski did not attempt to evaluate or interpret the results of the test. To do this would have been error because admittedly he was not qualified to make such an appraisal. Marlewski merely related the breathalyzer's reading, which he was competent to do.[9]

If a defendant wishes to challenge the machine itself, he may make an application for inspection under sec. 269.57, Stats., and ask the court to exercise its discretion by allowing a pretrial examination of the device.[10]

A defendant is still free to challenge the training and experience of the breathalyzer operator himself, as an "operator." A defendant may challenge the procedure employed by the operator in conducting the test. The defendant made none of these challenges in the instant

---

on the issue of intoxication but is not to be given any prima facie effect;

"(c) The fact that the analysis shows that there was fifteen-hundredths of one per cent or more by weight of alcohol in the person's blood is prima facie evidence that he was under the influence of an intoxicant, but shall not, without corroborating physical evidence thereof, be sufficient upon which to find the person guilty of being under the influence of intoxicants."

[9] *See* Annot. (1961), 77 A. L. R. 2d 971. In an analogous case, *Omohundro v. County of Arlington* (1953), 194 Va. 773, 75 S. E. 2d 496, the Virginia Supreme Court allowed a police officer to testify as to the reading of a "Drunk-O-Meter." The officer's qualifications (*i.e.*, no college training or courses in chemistry, and two days of instructions on the machine) were similar to Marlewski's. *See also, Toms v. State* (1952), 95 Okla. Crim. 60, 239 Pac. 2d 812. In *Alexander v. State* (Okla. Crim. 1956), 305 Pac. 2d 572, the court held that a police officer could testify as to the reading from a Harger drunkometer even though he did not understand and could not work the formula by which the machine produced the reading.

[10] *Appleton v. Sauer* (1956), 271 Wis. 614, 74 N. W. 2d 167.

case. The officer was entitled to testify as to his reading from the breathalyzer and the statute interpreted the reading to establish the fact prima facie that the defendant was driving under the influence of an intoxicant and the corroborating evidence of the officers was sufficient to support defendant's conviction.

*By the Court.*—Judgment affirmed.