PRECHEL and others, Appellants, v. CITY OF MONROE and others, Respondents: HARE and others, Intervening Defendants and Respondents.

*No. 92.   Argued September 5, 1968.—Decided October 4, 1968.*
(Also reported in 161 N. W. 2d 373.)

For the appellants there was a brief by *Campbell, Brennan, Steil & Ryan* and *David J. MacDougall,* all of Janesville, and oral argument by *Mr. MacDougall.*

For the respondents there was a brief by *William J. Schmitz,* city attorney of Monroe, and for the intervenors-respondents by *Regez, Johnson & Callahan* and *Rudolph P. Regez,* all of Monroe, and oral argument by *Mr. Schmitz* and *Mr. Rudolph P. Regez.*

HEFFERNAN, J. The appellants take the position that the legislative intent to permit a mandatory referendum is clear from the face of the statute. Admittedly, action of the Monroe city council was pursuant to sec. 66.43, Stats., the "Blighted Area Law." Sec. 66.43 (17) is the last subsection of that act. It provides:

"LIQUIDATION AND DISPOSAL. Projects held under this section may be liquidated and disposed of under s. 66.40 (25)."

Sec. 66.40 (25), Stats., is captioned, "LIQUIDATION AND DISPOSAL OF HOUSING PROJECTS," and provides, in part:

"(a) In any city or village the city council or village board by resolution or ordinance, or the electors by referendum under s. 9.20 may provide that the authority shall liquidate and dispose of a particular project or projects held and operated under ss. 66.40 to 66.404 or 66.43."

Subsections (b), (c), (d), (e), (f), (g), and (h) provide for bid procedures to be used in selling the project and for the payment of debts.

Sec. 9.20, Stats., provides for direct legislation and outlines the procedures whereby the electors can circulate a petition demanding that the council either pass legislation requested or submit the legislation to the vote of the people. In the event electors approve of the ordinance or resolution, it becomes effective without the necessity of further council approval. In the instant

case there is no question of the procedural adequacy of the initiative-referendum process used. The only question relates to whether, under the terms of secs. 66.43 (17) and 66.40 (25), the action of the electors in voting to discontinue the urban renewal project was mandatory on the council.

Appellants resort to the plain-meaning rule. *West Allis v. Rainey* (1967), 36 Wis. 2d 489, 495, 153 N. W. 2d 514; *Telemark Co. v. Department of Taxation* (1965), 28 Wis. 2d 637, 641, 137 N. W. 2d 407. They point out that sec. 66.43 (17), Stats., states that "Projects held under this section" (urban blight) may be liquidated as set forth in sec. 66.40 (25). The latter statute refers to and incorporates by reference sec. 66.43, the Blighted Area Law; and, hence, appellants contend that it is the plain meaning of the legislature that all projects under the act are included.

Respondents argue that only completed projects are referred to therein, but appellants also point out that the term, "projects," is explained by sec. 66.43, Stats., which defines a "redevelopment project" as:

". . . the preparation of a redevelopment plan, the *planning,* surveying, and other work incident to a redevelopment project, and the preparation of all plans and arrangements for carrying out a redevelopment project." (Emphasis supplied.)

They refer to sec. 66.40, Stats., *et seq.,* wherein at 66.40 (3) (j), "The term 'housing project' may also be applied to the *planning* of buildings." (Emphasis supplied.)

These statutes, though referring to housing, they contend, are *pari materia* and serve to clarify the legislature's intention that a redevelopment or urban blight project, like a housing project, is a "project" even though only in the planning stage. Moreover, the only "project" referred to in sec. 66.43, Stats., is a redevelopment project.

On oral argument the respondents acknowledge that the legislature left some control in the hands of the electors, but contend that it failed to give sufficient control to halt a blight project at a point short of completion.

Two groups of respondents appeared, represented by separate counsel. While both agree that the trial judge's refusal to grant the mandatory injunction was proper, they bottom their cause on different and somewhat incongruent arguments.

The city attorney has attempted to show that sec. 66.43 (17), Stats., was passed following the 1955 veto of Bill 593, A. That bill permitted a common council to eliminate an entire housing authority. The governor's veto message indicated that the power to terminate or eliminate was too broad and should be limited to the right to terminate particular projects, but not the entire authority.

Subsequent to this veto, ch. 682 of the Laws of 1955 was passed. This act was entitled, "An act to create 66.40 (25) and 66.43 (17) of the statutes, relating to liquidation and disposal of public housing projects."

Thus, the attorney for the respondent city argues that the word, "project," as referred to in sec. 66.43 (17), Stats., and sec. 66.40 (25) has nothing to do with the disposal, liquidation, or termination of an urban renewal or urban blight project—that the only purpose of the legislature was to liquidate particular *housing* projects. Under this view, insofar as urban blight is concerned, the statute is inapplicable and gives no authority whatsoever for a referendum, advisory or mandatory.

While the legislative history set forth by the city attorney gives weight to his argument, it fails to account for the fact that secs. 66.43, 66.43 (17), and 66.40 (25), Stats., are mutually incorporated by reference and the only "project" referred to in sec. 66.43 is the urban blight project. While the legislative history of an act

is persuasive of the legislature's intent, and the caption of an act may be resorted to as an indication of that intent, yet these sources of information cannot prevail in the face of the clear language of a statute to the contrary. *West Side Bank v. Marine Nat. Exchange Bank* (1968), 37 Wis. 2d 661, 669, 670, 155 N. W. 2d 587; *Wisconsin Valley Improvement Co. v. Public Service Comm.* (1960), 9 Wis. 2d 606, 618, 101 N. W. 2d 798. Here the incorporation by reference is a double one, and the section incorporated refers solely to blight. We thus are constrained to hold that the statute plainly on its face refers to, and authorizes, the liquidation of urban blight projects.

The attorney for the intervening defendants, certain taxpayers of Monroe and respondents herein, acknowledges the fact that such was the intent of the statute, but argues that only completed projects are authorized to be terminated by referendum, and that only completed projects are liquidable. We agree.

The statutes do not purport to apply to all projects under the Blighted Area Law. Rather, they apply in sec. 66.43 (17) to "Projects held," and in sec. 66.40 (25) to "projects held and operated under . . . 66.43." [1] Moreover, sec. 66.40 (25) (b) to (g) clearly indicate that liquidation was contemplated only under circumstances where tangible assets had been acquired and required disposition by sale. These subsections deal with the conversion of these assets into cash or credits and provide for the payment of debts and the protection of bondholders. What is contemplated by the statutory scheme is entirely foreign to the problem that arises when an urban renewal project has reached only the planning stage.

---

[1] Contrary to the unsupported assumption of the dissent that redevelopment projects are "created" only for liquidation, authorities are permitted by sec. 66.43 (3) (j) 2 "to retain such land for public use."

We are obliged to give meaning to the words, "held," and "held and operated."

"It is an elementary rule of statutory construction that effect must be given if possible to every *word*, clause, and sentence thereof. *State v. Columbian Nat. Life Ins. Co.* (1910), 141 Wis. 557, 566, 124 N. W. 502." *Northern Discount Co. v. Luebke* (1959), 6 Wis. 2d 313, 316, 94 N. W. 2d 605; *see also Greenebaum v. Department of Taxation* (1957), 1 Wis. 2d 234, 83 N. W. 2d 682.

We cannot assume that they were meaningless words and were not intended to designate the stage a project must attain before it could be liquidated. Using the normal meaning of the words, they are not applicable to a blight project that was in the planning stage. No project was then "held"; certainly it was not "held and operated." At best the project was merely a programmed concept for future acquisition and holding, and eventual disposition.

This court in *Landt v. Wisconsin Dells* (1966), 30 Wis. 2d 470, 141 N. W. 2d 245, pointed out that the history of direct legislation indicates a legislative mandate to limit the right of referendum, *i.e.*, the power of the electorate to repeal existing resolutions and ordinances, to those instances where there is an express grant of power to the electorate—a power that will not be broadened by implication.[2] In the instant case the grant of the referendum power to the electorate is limited to those cases where the urban blight project is "held and operated." To extend the power to instances not expressly authorized by legislation is unwarranted.

*By the Court.*—Judgment affirmed.

---

[2] None of the parties to this appeal questioned the right of the common council to repeal its own ordinances or resolutions, and the power of a council or other governing boards to do so is not at issue in this case. The grant of power to a municipal governing board is constitutional as well as legislative, and is far broader than the right of referendum conferred in certain clearly defined instances upon the electorate.

ROBERT W. HANSEN, J. (*dissenting*). Three challenges are made to the validity of the action taken by the voters of the city of Monroe by referendum directing the city council to "desist from any further action" in regard to a redevelopment project then in its planning stage.

The trial judge held the referendum to be advisory only, holding that, if mandatory, it would constitute an invasion of the responsibility of the city council to make expenditures and levy taxes. The court majority rejects this approach, and I agree. Actually, it is clear that, upon termination of the project in its planning stage, the city would have only to return to the federal government the unused portion of the federal "planning advance."

The city attorney for Monroe argues that the statutory provision for the liquidation of projects should be interpreted as applying to public housing projects only, not to redevelopment projects. The court majority rejects this argument, and I agree. As the majority opinion points out, ". . . the statute plainly and on its face refers to, and authorizes, the liquidation of urban blight projects," as authorized by sec. 66.43, Stats.

Intervening defendants, certain property owners in Monroe, contend that the legislature was concerned only with providing for the liquidation and disposal of ". . . a completed project, being operated by the city" and that sec. 66.43 (17), Stats., does not permit the electorate to prohibit the council from planning, undertaking or proceeding with a redevelopment project. The court majority accepts this contention and interpretation of the statute. I disagree with both the reasoning and result.

In the first place, this interpretation is based upon an incorrect understanding of what a redevelopment project under sec. 66.43, Stats., really is. It confuses such redevelopment project with a public housing project under sec. 66.40. The end result of a housing project is a

building or set of buildings that are to be "operated." Usually, the end result of a redevelopment project is the sale of acquired property and cleared areas to private developers. The public housing project always is created to be "operated." The redevelopment project usually is created to be liquidated.

When the plan has been prepared, the land has been acquired, the area has been cleared, existing buildings and structures have been demolished or removed, and where the leveled land has been sold or leased for industrial or commercial use, the redevelopment project has liquidated itself. There is less left to be "held" or "held and operated" than there was when the project was in its planning stage. Are those who oppose the clearance of an area for subsequent development to wait to object until the present character of the area has been destroyed and the project completed by sale of the leveled land to developers? Must they wait until their battle has been lost to begin it? It is difficult to believe that the legislature intended that they may act to liquidate the project only after the project has liquidated itself.[1]

Giving the statute involved so sharply limited an interpretation creates a new kind of flypaper. This interpretation holds fast only the local community during the planning phase of a redevelopment project. The statute authorizing liquidation of such projects provides that ". . . the city council or village board by resolution or ordinance, or the electors by referendum under s. 9.20, may provide that the authority shall liquidate and dis-

[1] If this redevelopment project statute (sec. 66.43) instead of the condemnation laws (ch. 32, Stats.) were to be used to acquire property to be retained "for public use," as for park, schoolhouse or new city hall, as the majority opinion suggests it could be, it remains a more reasonable interpretation to permit liquidation of such project in the planning stage rather than only after such park, schoolhouse or new city hall has been completed.

pose of a particular project or projects . . ." (sec. 66.40 (25) (a), Stats.). So, at least as far as this statutory authorization for discontinuance or liquidation of a project is concerned, the local community, once involved, cannot liquidate or discontinue the project until it has been completed. This is sticky flypaper indeed. At the same time, the federal government can discontinue its participation and effectively liquidate the project, at least during the planning stage, by simply not approving the plan submitted and not making available federal funds. It is impossible to believe that the legislature intended such result.

This strained interpretation of the legislative intent is not required by sec. 66.43, Stats., the "Blighted Area Law," which is here involved. In fact, it goes contrary to the meaning and intent of sec. 66.43 (17), providing: "LIQUIDATION AND DISPOSAL. Projects held under this section may be liquidated and disposed of under s. 66.40 (25)." The key question is whether a redevelopment project in its planning stage is a "project" within the meaning of this section. We need not turn to Funk and Wagnalls for the answer. The legislature has clearly stated exactly what the word "project" in the redevelopment project statute is to mean. Here is that statutory definition:

Sec. 66.43 (3) (j) 2. " 'Redevelopment project' means any work or undertaking to acquire blighted areas or portions thereof, and lands, structures, or improvements, the acquisition of which is necessary or incidental to the proper clearance or redevelopment of such areas or to the prevention of the spread or recurrence of slum conditions or conditions of blight in such areas; to clear any such areas by demolition or removal of existing buildings, structures, streets, utilities, or other improvements thereon and to install, construct, or reconstruct streets, utilities, and site improvements essential to the preparation of sites for uses in accordance with a redevelopment

plan; or to sell, lease or otherwise make available land in such areas for residential, recreational, commercial, industrial or other use or for public use, or to retain such land for public use, in accordance with a redevelopment plan. *The term 'redevelopment project' may also include the preparation of a redevelopment plan, the planning, surveying, and other work incident to a redevelopment project, and the preparation of all plans and arrangements for carrying out a redevelopment project. . . ."* (Emphasis supplied.)

This is the legislature's definition of the meaning of the word "project," as referred to in sec. 66.43, Stats. Does it separate a redevelopment project into a planning stage, an acquisition stage, a demolition stage, a sale or lease stage, a stage of completion? Does it imply that a redevelopment project becomes a project, subject to the liquidation and disposal section, only after it has been completed? I think not. From its beginning with the preparation of the redevelopment plan to its termination by sale of acquired land, the project is just that, a "project" within the meaning of the statute. Where the legislature is saying that the preparation of a redevelopment plan may be included in the term "project," the majority opinion is holding that it may not be. Where the legislature is linking all steps from "the planning" to the final sale of the land acquired and cleared, the majority opinion excludes all except the final "completed" stage from the definition of the term "project." What the legislature joined together, the court rends asunder. This does violence to the clear meaning of the statute and clear intent of the legislature.

The more reasonable interpretation of what the legislature intended and what the legislation does is that it grants to city councils and village boards by resolution, or electors by referendum, the authority to terminate, dispose of and liquidate a redevelopment plan or project with which they are dissatisfied at any stage of the

project's development, including the planning stage. Such interpretation would require that the judgment of the circuit court in this case be reversed and judgment entered for the plaintiffs in accordance with their complaint.