CITY OF MILWAUKEE, a municipal corporation;
City of Madison, a municipal corporation;
City of Eau Claire, a municipal corporation;
Village of Black Earth, a municipal corporation;
City of Cumberland, a municipal corporation;
City of Marshfield, a municipal corporation;
City of Monroe, a municipal corporation;
City of West Bend, a municipal corporation,
Petitioners,

v.

Kenneth E. LINDNER, Secretary of the Department of Administration, State of Wisconsin; Department of Administration, State of Wisconsin; Mark E. Musolf, Secretary of the Department of Revenue, State of Wisconsin; Department of Revenue, State of Wisconsin, Respondents.

Supreme Court

*No. 80–1643–OA. Argued October 17, 1980.—
Decided October 28, 1980.*
(Also reported in 297 N.W.2d 828.)

For the petitioners there were joint briefs by *James B. Brennan,* city attorney and *Thomas E. Hayes,* deputy city attorney, for city of Milwaukee; *Henry A. Gempeler,* city attorney, and *John E. Rothschild,* assistant city at-

torney, for city of Madison; *Frederick W. Fischer,* for city of Eau Claire; *John N. Kramer,* village attorney, of Fennimore, for village of Black Earth; *Daniel D'Amico,* city attorney, for city of Cumberland; *John H. Stauber,* city attorney, for city of Marshfield; *William J. Schmitz,* city attorney, for city of Monroe; *Thomas O'Meara, Jr.,* acting city attorney, for city of West Bend; and oral argument by *James B. Brennan* and *Thomas E. Hayes,* of Milwaukee.

For the respondents the cause was argued by *Gerald S. Wilcox,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

Amicus curiae brief was filed by *Burt P. Natkins,* legal counsel, and *Le Roy A. Lokken,* assistant legal counsel, of Madison, for League of Wisconsin Municipalities.

Amicus curiae brief was filed by *Daniel T. Kelley* and *Hansen Eggers, Berres & Kelley, S. C.,* of Beloit, for Wisconsin Alliance of Cities, Inc.

STEINMETZ, J.   This court, by order dated September 10, 1980, granted the petitioners' petition for leave to commence an original action for a declaratory judgment with regard to the authority of the secretary of the Department of Administration under sec. 16.50(2), Stats., to reduce shared revenue payments to municipalities. The facts in the case are not in dispute, the parties having filed an "Agreed Statement of Facts" with the court.

The agreed facts will be referred to in the decision.

## *ISSUE*

(1) Does sec. 16.50(1) and (2), Stats., authorize respondents to reduce payments to municipalities under secs. 79.03 and 79.16(3) below amounts appropriated by the legislature for distribution to all municipalities on November 17, 1980?

## STATEMENT OF THE CASE

Under the state budget law for the biennium July 1, 1979, to June 30, 1981, the legislature appropriated the sum of $413 million to the "shared revenue account" for distribution to all municipalities in fiscal year 1980–81 pursuant to secs. 79.03(2) and 79.03(4)(f), Stats.[1] The legislature also appropriated a "sum sufficient" for the personal property tax relief transfer payment to be made in fiscal year 1980–81 to all municipalities pursuant to sec. 79.16(3).[2] Under the formula established

[1] Sec. 79.03(2), Stats., provides:

"(2)(a) Every municipality's portion of the amount distributable under sub. (1) based on population shall, except as affected by s. 79.06(1), equal .8375 of the final distribution per capita factor times its population, as defined in s. 79.07, and every county's portion of the amount distributable under sub. (1) based on its population shall equal .1625 of the final distribution per capita factor times its population, as defined in s. 79.07.

"(b) For purposes of par. (a), 'final distribution per capita factor' means:

"1. For the 1976 distribution, $40.

"2. For the 1977 to 1983 distributions, the lesser of the product of the 1976 population of the state times $40 divided by the population of the state in the current year, or $40.

"3. For the 1984 distribution and thereafter, the total amount distributed under s. 70.966(2)(b) in 1983 divided by the population of the state in the current year, plus the amount determined under subd. 2."

"79.03(4)(f)   In 1979 and 1980 the total amount to be distributed under this subchapter, except amounts distributed under s. 79.06, shall be $372,000,000 and $413,000,000, respectively."

[2] Sec. 79.16(3), Stats., provides:

"(3) SHARED REVENUE ACCOUNT TRANSFER. An amount equal to the amount determined under sub. (2) shall be transferred on October 30 by the department of administration from the appropriation under s. 20.835(2)(b) to the appropriation under s. 20.835(1)(h) to be distributed under s. 79.03(3). This amount shall not be included in computations under s. 79.06 and shall not be treated as a shared revenue for purposes of s. 60.175, 61.46, 62.12, 65.07 or 70.62. Annually, the department of revenue shall, with

to determine the sum sufficient, the respondent Department of Revenue has estimated that $57,315,400 would be transferred to the "shared revenue account" for distribution in this fiscal year.

The respondent Lindner, based on the certification of respondent Musolf, is to make a November distribution from the "shared revenue account" pursuant to sec. 79.03, Stats., on the third Monday in November. Under sec. 79.16(3), the personal property tax relief transfer payment is to be distributed to municipalities along with the November distribution of shared revenues. Under current estimates of the respondents, there will be sufficient revenue available in the general fund to make all payments to municipalities in November of 1980 in accordance with appropriations of the legislature for that purpose. Indeed, based upon respondents' estimates, there will be sufficient revenue available in the general fund to meet all expenditures contemplated under appropriations of the legislature during that quarter.

Based in part on revised estimates submitted by respondent Musolf for the fiscal year 1980–81, respondent Lindner has projected a budget deficit for the fiscal year 1980–81 of $145.4 million. This means that under current estimates of the respondents, there will not be sufficient revenue available in the general fund during the second quarter of calendar year 1981 (fourth quarter fiscal 1980–81) to meet all expenditures contemplated by appropriations of the legislature as reflected by the biennium budget. Based upon the projected deficit at the close of fiscal year 1980–81, respondent Lindner has

the assistance of the department of public instruction, provide estimates of the amounts to be transferred under this paragraph to counties, towns, villages and cities. The 1978 estimate shall be made on or before October 21, 1977. The estimate for each succeeding year shall be made on the 3rd Friday after the 1st Monday of October."

directed a 4.4% reduction to be made in allotments against local tax relief and general purpose revenue appropriations for the fiscal year 1980–81. In implementation of this directive, the respondents intend to apply a uniform 2.1% reduction in the November payments to all municipalities under sec. 79.03(2), Stats., and a uniform 4.4% reduction in the November payments to all municipalities under sec. 79.16(3).

Respondents claim authority to make the aforementioned reduction in the November distribution to all municipalities under sec. 16.50(2), Stats.

The "Municipal and County Shared Tax Account" was established at sec. 79.01, Stats., by ch. 125, Laws of 1971. It was changed into a Shared Revenue System by ch. 29, Laws of 1977.

Ch. 125, Laws of 1971, completely revised the method of sharing state collected taxes with local units of government. Beginning in 1972, the local share of the income taxes, utility taxes, liquor taxes and motor vehicle registration fees were placed in the Municipal and County Shared Tax Account. This account became the "Municipal and County Shared Revenue Account" established at sec. 79.01(2), Stats.,[3] by sec. 887, ch. 29, Laws of 1977, and was then funded by a system of fixed appropriations.

Ch. 34, Laws of 1979, made further refinements in the Shared Revenue System. Sec. 79.03(4)(f), Stats.,[4] was amended to provide that the appropriations to the shared

---

[3] Sec. 79.01(2), Stats., provides:

"(2) There is established an account in the general fund entitled the 'Municipal and County Shared Revenue Account,' referred to in this chapter as the 'shared revenue account.' There shall be appropriated to the shared revenue account the sums specified in this subchapter."

[4] "79.03(4)(f)  In 1979 and 1980 the total amount to be distributed under this subchapter, except amounts distributed under s. 79.06, shall be $372,000,000 and $413,000,000, respectively."

revenue account were fixed at $372 million for 1979–80 and $413 million for 1980–81.

Thus a system whereby local revenue sharing would fluctuate with the rise and fall of state revenues was changed to a system of fixed appropriations. As state revenues increased, greater amounts of funds would be available for other state purposes. As state revenues decreased, lesser amounts of funds would be available for other state purposes.

It is obvious from this legislative history that the Wisconsin legislature introduced a measure of stability in local government revenues by the fixed appropriations of $372 million and $413 million for 1979 and 1980, respectively.

A formula for adjustments for future years was established by ch. 29, Laws of 1977. Beginning in the 1981–82 fiscal year the shared revenues will be adjusted by the annual percentage increase in general fund revenues, with the annual increase of not more than 12% nor less than 5%. Sec. 79.03(4)(c), Stats.[5]

---

[5] Sec. 79.03(4)(c), Stats., provides:

"(c) Annually, beginning in 1979, the amount entered into the shared revenue account for total distributions under this subchapter shall increase over the amount entered for the prior year, excluding the amount transferred from the appropriation under s. 20.835(2)(b) pursuant to s. 79.16, by the same rate as the actual rate of annual increase in the amount of general fund tax revenue collected by the state in the fiscal year ending during the calendar year of the distribution under this section, but not more than 12% or less than 5%. The amount entered in the shared revenue account in fiscal year 1982–83 under s. 79.17(7) shall be considered as part of the prior year base amount for the purpose of computing the calendar year 1983 distribution under this paragraph. The total amount paid to municipalities and counties in 1983 under s. 70.996 shall be considered as part of the prior year base amount for the purpose of computing the calendar year 1984 distribution under this paragraph."

Elaborate formulae have been established in ch. 79 for distribution of shared revenues in four types of payments:[6]

(1) Per capita payments
(2) Utility payments
(3) Aidable revenue payments
(4) Minimum guaranteed payments.

The legislature made it clear in the 1979 budget bill at sec. 905m, ch. 34, Laws of 1979, amending sec. 79.03 (4) (f), Stats., in making the appropriation to the shared revenue account as to the intent that the moneys provided were to be distributed. The section is stated in mandatory terms: ". . . In 1979 and 1980 the total amount to be distributed . . . *shall* be $372,000,000 and $413,000,000, respectively." (Emphasis added.)

Sec. 16.50(1) and (2), Stats., reads as follows:

"16.50 **Departmental estimates.** (1) EXPENDITURES. Each department except the legislature and the courts shall prepare and submit to the secretary an estimate by quarters of the amount of money which it proposes to expend upon each of its divisions, activities, functions and programs. The secretary may waive the submission of estimates of other than administrative expenditures from such funds as he determines. Estimates shall be prepared in such form and at such times as the secretary requires. Revised and supplemental estimates may be presented at any time under rules to be prescribed by the secretary.

"(2) ACTION THEREON BY SECRETARY. The secretary shall examine each such estimate to determine whether appropriations are available therefor and can be made without incurring danger of exhausting such appropriations before the end of the appropriation period and whether there will be sufficient revenue to meet such contemplated expenditures. The secretary also shall examine each estimate to assure as nearly as possible that the proposed plan of program execution reflects the in-

---

[6] *The Wisconsin Taxpayer*, Vol. 48, No. 2, February, 1980, at 3–5.

tentions of the joint committee on finance, legislature and governor, as expressed by them in the budget determinations. If satisfied that such estimate meets these tests, he shall approve the same; otherwise he shall disapprove the same, in whole or in part, as the facts require. If the secretary is satisfied that an estimate for any period is more than sufficient for the execution of the normal functions of a department, he may modify or withhold such estimates. It is the intent of the legislature that this section be strictly construed by the secretary to the end that such budget determinations and policy decisions reflected by such determinations be implemented to the fullest extent possible within the concepts of proper management."

Where a statute is unambiguous, the court must give effect to its ordinary and accepted meaning as stated in *National Amusement Co. v. Dept. of Revenue,* 41 Wis.2d 261, 266, 163 N.W.2d 625 (1969) :

"There are some rules of construction which are fundamental to this case. First, when statutory language is clear and unambiguous,
" '. . . no judicial rule of construction is permitted, and the court must arrive at the intention of the legislature by giving the language its ordinary and accepted meaning.' *West Allis v. Rainey* (1967), 36 Wis.2d 489, 495, 153 N.W.2d 514; and *State v. Resler* (1952), 262 Wis. 285, 55 N.W.2d 35."

The test to determine whether a statute is ambiguous also was stated in *National Amusement, supra,* at 267 :

"This court has consistently used the same test for ambiguity:
" 'A statute or portion thereof is ambiguous when it is capable of being understood by reasonably, well-informed persons in either of two or more senses.' *State ex rel. Neelen v. Lucas* (1964), 24 Wis.2d 262, 267, 128 N.W.2d 425, citing *State ex rel. West Allis v. Dieringer* (1957), 275 Wis. 208, 218, 81 N.W.2d 533."

The following rule is also applicable:

" '. . . In construing or "interpreting" a statute the court is not at liberty to disregard the plain, clear words of the statute.' *State v. Pratt* (1967), 36 Wis.2d 312, 317, 153 N.W.2d 18." *National Amusement, supra,* at 268.

Sec. 16.50, Stats., is not ambiguous on its face, conveys a plain meaning and resort to matters outside the statute, such as legislative history to interpret it, is not necessary nor permissible.

Ch. 34, Laws of 1979, referred to as the Executive Budget Bill, in sec. 20.56, Stats. (Department of Revenue) contains no reference to the shared revenue nor to the property tax relief appropriations. Neither are they listed under sec. 20.505 for the Department of Administration. These appropriations are found in sec. 20.835, "General Appropriations." They therefore were not contemplated by the legislature to be a division, activity, function or program of the Department of Revenue, nor of the Department of Administration and, therefore, are not under the requirements of sec. 16.50. The Department of Revenue under the budget bill is a conduit only for the funds appropriated under shared revenue and property tax relief to be transferred to the municipalities and counties.

The attempted application of the statute by the secretary is not in accord with the plain and unambiguous language of the statute. The action attempted by the secretary would be contrary to legislative intent clearly stated and can be achieved only by the legislature.

The purported interpretation of the statute by the secretary is not binding upon the court. Ordinarily the interpretation placed upon a statute by an administrative agency charged with the duty of applying such statute is

given great weight. This general rule fails when a statute is not ambiguous:

" '. . . administrative interpretation is only of significance where there is an ambiguity in the statute. It cannot overcome the plain wording of a statute where there is no ambiguity.' *Nelson v. Ohio Casualty Ins. Co.* (1966), 29 Wis.2d 315, 320, 139 N.W.2d 33." *National Amusement, supra,* at 274.

As stated in *Moherek v. Tucker,* 69 Wis.2d 41, 45, 230 N.W.2d 148 (1975) :

"As this court said in *Amidzich v. Charter Oak Fire Ins. Co.* (1969), 44 Wis.2d 45, 51, 170 N.W.2d 813:

" 'When a plain meaning of a word of a statute or contract is apparent, we need not resort to either construction or case law to bolster our recognition of that plain meaning.' "

The importance of primary consideration of the language of the statute itself was pointed out in *State v. Wilson,* 77 Wis.2d 15, 21, 252 N.W.2d 64 (1977) :

"In construing a statute the primary source of construction is the language of the statute itself. *State v. Consolidated Freightways Corp.,* 72 Wis.2d 727, 737, 242 N.W.2d 192 (1976)."

The court does not discuss sec. 20.725, Stats. (now sec. 13.101(7) (b) 1.) due to the clear and unambiguous meaning of sec. 16.50(1) and (2), the statute relied on by the secretary of administration for the action attempted.

*By the Court.*—The court issues a permanent injunction enjoining the respondent, secretary of the Department of Administration, from reducing payments to municipalities under secs. 79.03 and 79.16(3), Stats., below amounts appropriated by the legislature for distribution to all municipalities on November 17, 1980.