WEST SIDE BANK, Appellant, v. MARINE NATIONAL EXCHANGE BANK, Respondent: PAINE, WEBBER, JACKSON & CURTIS and another, Defendants: SWIDLER, Impleaded Defendant.

*January 5—January 30, 1968.*

662

664

For the appellant there was a brief by *Lichtsinn, Dede, Anderson & Ryan* of Milwaukee, and oral argument by *Eldred Dede.*

For the respondent there was a brief by *Foley, Sammond & Lardner,* attorneys, and *Marvin E. Klitsner, John R. Collins,* and *James O. Huber* of counsel, all of Milwaukee, and oral argument by *Mr. Klitsner.*

HEFFERNAN, J.

*Were West Side's affidavits in support of summary judgment defective for lack of personal knowledge*

Marine alleges on this appeal that West Side's affidavits are on their face defective for they purport to state the internal procedures of Marine that would only be known to an officer or employee of Marine. This court

has uniformly held that affidavits made by persons who do not have personal knowledge are insufficient and will be disregarded [1] and that affidavits made only on the basis of the affiant's information and belief fail to establish evidentiary facts, and mere assertions of ultimate facts are equally ineffectual. [2] While these propositions of law urged by the respondent are without doubt correct, yet it appears that this defense, the procedural inadequacy of the affidavits, is raised for the first time on appeal. Had the question been raised in the trial court and West Side's affidavits were then found insufficient, the appellant would have been entitled to renew its motion upon the submission of affidavits in compliance with the summary-judgment statute. [3]

It is thus apparent that it would be unjust to allow the respondent to prevail upon an argument raised for the first time in this court. In essence, the factual controversy that Marine asserts arises out of the fact that Marine claims to have an additional and crucial step in its "process of posting"—a final exercise of judgment for the purpose of determining whether for any reason whatsoever the entries theretofore made are to be reversed or errors corrected. Marine asserts that it is not until this point that there is determination of "final payment." While the affidavit of West Side disputes this assertion, it

[1] *Leszczynski v. Surges* (1966), 30 Wis. 2d 534, 538, 141 N. W. 2d 261.

[2] *Townsend v. Milwaukee Ins. Co.* (1962), 15 Wis. 2d 464, 113 N. W. 2d 126; *McNally v. Goodenough* (1958), 5 Wis. 2d 293, 92 N. W. 2d 890; *McChain v. Fond du Lac* (1959), 7 Wis. 2d 286, 96 N. W. 2d 607; *Kubiak v. General Accident Fire & Life Assur. Corp.* (1962), 15 Wis. 2d 344, 113 N. W. 2d 46; *Wojciuk v. United States Rubber Co.* (1961), 13 Wis. 2d 173, 108 N. W. 2d 149.

[3] *Hale v. Lee's Clothiers & Jewelers, Inc.,* ante, p. 269, 155 N. W. 2d 51; *Krause v. Western Casualty & Surety Co.* (1958), 3 Wis. 2d 61, 87 N. W. 2d 875; *Townsend v. La Crosse Trailer Corp.* (1950), 256 Wis. 609, 42 N. W. 2d 164; *Fuller v. General Accident Fire & Life Assur. Corp.* (1937), 224 Wis. 603, 272 N. W. 839.

is essentially its position that, as a matter of law, the provision for the reversal of entries applies only to errors of a mechanical or clerical nature and is not relevant to the judgment factors that enter into final payment and that final payment is determined at an earlier stage of the proceedings when the "process of posting" is completed.

Marine, by failure to object to West Side's affidavits in the trial court, has waived the right to do so now, and West Side has chosen not to base its argument on the factual dispute but upon the proposition that, although the facts are as asserted by Marine, they are irrelevant as a matter of law and ineffective to defer the time of "final payment" as defined in the Uniform Commercial Code. We therefore conclude that it is proper for this Court to consider the legal issues insofar as they are relevant to sustaining or reversing the order denying the plaintiff's motion for summary judgment.

*Did Marine become accountable to West Side for the amount of the check by "final payment" of the item*

The Uniform Commercial Code provides that, upon final payment, the payor bank shall become accountable for the amount of the item (sec. 404.213 (1a), Stats.). Insofar as sec. 404.213 [4] is relevant to this case it pro-

---

[4] Sec. 404.213, Stats., provides in part:

"404.213 **Final payment of item by payor bank; when provisional debits and credits become final; when certain credits become available for withdrawal.** (1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

"(a) Paid the item in cash; or

"(b) Settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or

"(c) Completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or

vides that an item is finally paid when the bank has "completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith" (sec. 404.213 (1) (c)).

The "process of posting" is defined in sec. 404.109, Stats.:

"404.109  **Process of posting.**  The 'process of posting' means the usual procedure followed by a payor bank in determining to pay an item and in recording the payment, including one or more of the following or other steps as determined by the bank:
" (1)    Verification of any signature;
" (2)    Ascertaining that sufficient funds are available;
" (3)    Affixing a 'paid' or other stamp;
" (4)    Entering a charge or entry to a customer's account;
" (5)    Correcting or reversing an entry or erroneous action with respect to the item."

It is upon this statute that the appellant primarily relies. It contends that the "process of posting" was completed when Marine decided to pay the item as was evinced by verification of the signature, ascertainment that there were sufficient funds to the credit of the drawer's account, charging of the account, stamping the check "paid" or "cancelled," and filing the check with the customer's file as a voucher to be returned to him. It is clear that all of these steps were carried out by Marine and that they constituted the performance of at

"(d) Made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.

"(1a) Upon a final payment under sub. (1) (b), (c) or (d) the payor bank shall be accountable for the amount of the item.

"(2) If provisional settlement for an item between the presenting and payor banks is made through a clearing house or by debits or credits in an account between them, then to the extent that provisional debits or credits for the item are entered in accounts between the presenting and payor banks or between the presenting and successive prior collecting banks seriatim, they become final upon final payment of the item by the payor bank."

least the first four of the steps required in the process of posting.

Marine, however, contends that until the fifth step, "correcting or reversing an entry or erroneous action with respect to the item," is considered and determined, either affirmatively or negatively, the process of posting is not completed. Marine contends that it may defer this decision until the last possible time that will allow it to make a return of the item; and only (in the absence of some other unequivocal conduct) upon its decision not to reverse the entries or upon its failure to make a timely return of the item is there final payment.

West Side contends that Marine's interpretation would minimize the effect of sec. 404.213 (1) (c), Stats., and would almost completely negate the possibility of using completion of the "process of posting" as the benchmark for determining final payment. Marine's argument in essence is that, so long as time remains in which entries can be reversed (until the clearinghouse deadline), a check is not finally paid under the Code. Marine contends, and the trial court agreed, that sub. (5) of sec. 404.109 permitted the payor bank to reverse any entry, whether the original entry was correct or erroneous. West Side contends that this subsection permits only the correction of an error or the reversal of erroneous action.

It would appear whatever rationaliae may be offered to the contrary, and they are numerous, reason must yield to the plain meaning of the statute. No limitation is set forth in the legislation. The phrase the legislature used was "reversing an entry." Only by the most strained interpretation is it possible to glean from the face of the statute the inference that the entry must have been made in error. While the legislative intent may have been otherwise, and there is evidence that some authors prominent in the preparation of the Code concluded that only erroneous entries were intended, yet it is not within the province of this court to seek secondary sources of

legislative intent where the meaning of the statute is plain and unambiguous.[5]

Persuasive argument for West Side's position is found in 38 Ind. L. J. (1962–1963), 693, 717, wherein the interpretation urged by Marine is discussed:

"Subsections (a), (b) and (c) set out points of time which are somewhat earlier than what has normally been considered the 'process of posting,' whereas subsection (d) is the action which has normally been held to constitute the vital determining factor. Without the detailed definition of section 4–109, subsection (d) would stand as the relevant activity of the payor for accountability under section 4–213 (1) (c), however, subsection (e) of 4–109 broadens the definition of the 'process of posting' to make it almost meaningless. A payor bank, it appears, is now able to reverse an entry which was previously considered final. In other words, the payor bank can perform one of the vital steps in (a), (b), (c) or (d) and it would not be accountable since, by the plain meaning of subsection (e), it can correct or reverse an entry as it sees fit.

"Why such extreme latitude is permitted after the Code has gone to great lengths to set out a precise point of time for payor accountability is difficult to comprehend. Perhaps, in the desire to be consistent, this subsection should be read narrowly to apply *only* to erroneous entries. If it can be limited to mechanical errors of the entry, then the preciseness of section 4–213 (1) will not be lost. If it is not narrowed to this point, however, the payor bank would be able to charge the account of the drawer and later reverse this charge, contending that the initial entry was erroneous, since it did not realize that the drawer had insufficient funds.

"It is thus seen that the plain meaning of section 4–109 would destroy the effect of section 4–213 (1) (c) and negate the effect of the Code for consistency in each section where final payment is a consideration. Perhaps,

---

[5] *State v. Resler* (1952), 262 Wis. 285, 55 N. W. 2d 35; *State ex rel. Badtke v. School Board* (1957), 1 Wis. 2d 208, 83 N. W. 2d 724; *Weather-Tite Co. v. Lepper* (1964), 25 Wis. 2d 70, 130 N. W. 2d 198; *Miller v. Wadkins* (1966), 31 Wis. 2d 281, 142 N. W. 2d 855.

if litigation should arise under any of the final payment sections, the narrow construction would appeal to the court, but until such a time a result of such litigation is unpredictable. If limitation and clarification is not possible, the only alternative would seem to be repeal of subsection (e)."

We can only echo the sentiments expressed in the commentator's last sentence. If the interpretation that is urged by Marine, which we accept, fails to comport with the intent of the framers of the Code, there must be a resort to legislative clarification. We cannot, however reasonable West Side's argument might be, conclude that the interpretation of the trial court constitutes a deviation from the intent of the framers of the Code.

Fairfax Leary, Jr., formerly the reporter for Article 4 of the Code, writing in 49 Marq. L. Rev. (1965–1966), 331, pointed out that the "process of posting" is a combination of two diverse elements—one is the element of judgment in determining whether or not payment should be made and the other is the mechanical element of recording the item. The oral arguments of both parties to this appeal and the affidavits in support and in opposition to the motion make it clear that the computer merely records the information fed into it and only after the computerized facts are sorted and recorded do the officers and employees of the bank apply the judgment factors that culminate in the decision to pay.

The Leary article, considering the prejudgment recording by the computer, stresses the need for the maximum time for the correction of entries and argues that this procedure is an integral part of the "process of posting." He states at page 360:

"And so one of the included steps in the process of posting includes the correction of errors and the reversal of entries. It would seem to follow, then, that the subdivision of Section 4–213 (1) based on 'completion of the process of posting' would not be satisfied, until the time within which entries could be reversed had expired. So

long as time remains in which entries could be reversed, it would, in view of the enumeration of 'reversal of entries' as one of the steps included in the 'process of posting', be difficult for a court to say that the 'process of posting' had been completed. Normally, in the non-clearings-cash-letter-for-credit-in-an-account situation this means that the process of posting is not completed until the expiration of the midnight deadline where the bank is working three shifts in its processing of checks, otherwise at the close of operations next preceding the midnight deadline."

We conclude, rejecting the constricted meaning of sec. 404.109 (5), Stats., urged by the appellant, that the plain meaning of the statute permits the reversal of entries for any reason whatsoever (subject to the good-faith provisions of the Code) if made within the time limited for return of items to the clearinghouse.

*Do clearinghouse rules allowing return of unacceptable items on second business day following presentment supersede the process of posting rule under the Code*

Marine argues that, even if it were held accountable under the Code, it is exonerated from liability by reason of the clearinghouse agreement to which both Marine and West Side are signatories. By-law IV, sec. 3, of the clearinghouse agreement expressly provides that unacceptable items are returnable through the exchanges on the second business day following the date they are presented at the exchange. Marine returned the Swidler check to West Side within the time limit. Sec. 404.103 (1), Stats., specifically provides that the effect of the Code may be varied by agreement, and sec. 404.103 (2) provides that clearinghouse rules have the effect of such agreements.

Fletcher R. Andrews, Dean of the School of Law at Western Reserve University, in his article, *The City*

*Clearing House: Payment, Returns, and Reimbursement,*[6] recognized before the adoption of the Code that clearing-house rules are strong evidence of the intention of banks regarding the time in which a decision to pay a check may be made. Dean Andrews states:

"Consequently, the only problem causing any difficulty arises when the drawee bank debits the drawer's account, and later wishes to cancel the entry, treat the check as dishonored, and return it to the presenting bank within the time stipulated by the clearing house rule. In debiting the drawer's account, the bank has performed an act which ordinarily is considered payment. But the banks, by rule, have agreed that items may be returned before a certain hour. Since payment is a matter of intent, and the parties have set down their intent in the rules of the clearing house, the solution of the problem becomes merely a matter of interpretation of the rule . . . .

"It may conceivably be argued that a [returned] . . . item means only an item which never has been charged against the drawer's account, by reason of the discovery of a shortage of funds, forgery, or the like. The argument gains in plausibility when it is recalled that checks are inspected for irregularities, omissions, forgeries, and other defects before being entered in the general ledger, and that the bookkeeper examines the state of the drawer's account before making his entry. As a consequence, the item might be regarded as 'good' or 'paid' when, after successfully completing the several tests, it is finally charged against the drawer. Yet this interpretation seems to overlook the fundamental purpose of the rule, which is to permit the banks to wait until a certain time before finally deciding whether to honor or dishonor the items presented. Had the banks wished to make the debiting of the drawer's account the last 'rite,' they could easily have said so in their rule. In the absence of a provision to that effect, the rule should be interpreted to mean that the check is not paid until the expiration of the return period." [7]

In view of the express approval of the statutes that the Code may be waived or altered by agreement, we are

---

[6] 27 Ind. L. J. (1951–1952), 155.

[7] *Id.* pages 167, 168.

compelled to hold that the clearinghouse agreement supersedes any inconsistent portions of the Code, and in this instance additionally serves to expand the time in which entries may be reversed. Moreover, such modifications are within the stated purpose of the Code (sec. 401.102 (2) (b), Stats.) "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties."

Related to the desirability of recognizing local agreements in derogation of specific provisions of the Code is the statute's express standard that final payment is dependent not upon some objective universal standard, but upon the subjective test of "the usual procedure followed by the payor bank." (Sec. 404.109, Stats.) The affidavits of Marine tend to show that no decision in respect to payment was made until a judgment was reached regarding the reversal or nonreversal of entries and that the process of posting was not completed until the time for reversal expires. The recent case of *Gibbs v. Gerberich* (1964), 1 Ohio App. 2d 93, 98, 203 N. E. 2d 851, stressed the subjective test to be applied:

"The key point in a bank's completion of the 'process of posting' is the completion of all of the steps followed in the *particular* bank's payment procedure." (Emphasis supplied.)

While a motion for summary judgment does not constitute a trial by affidavit, it is apparent that the affidavits of Marine, if believed at trial, would lead to the conclusion that the exercise of judgment following the computerized phase of the posting process to determine whether or not entries should be reversed constituted an essential part of Marine's process of posting and making "final payment."

The rules of the Milwaukee County Clearing House Association, upon which Marine relies, reflect the practical problems involved in handling quantities of bank

checks by mechanical or electronic devices. The use of such devices rests upon the assumption that there will be sufficient time after the mechanical processes are completed for the human factor of judgment to be exercised and upon the statistically derived conclusion that only a very small proportion of the checks in circulation will present problems that require individual treatment. It has been estimated that in 1963 the Federal Reserve System handled 4,700,000,000 items for collection and the Federal Reserve Bank of Chicago alone handled 700,000,000. The annual check volume countrywide is believed to exceed 50,000,000 a day and 13,000,000,000 a year. Fairfax Leary, Jr., in 49 Marq. L. Rev. 331, 333, 334, points out that two principles have guided the selection of rules governing the law of check collections:

"One is that the rules must be suitable for a bulk processing of large numbers of checks at little cost. The second, which is a corollary of the first, is that rules to ensure a proper allocation of losses incurred in the area of the one eighth of one percent of bad items should not be so restrictive as to clog the free flow and smooth handling of the almost unanimous number of *good checks, collections in bulk, and deferred posting.*"

It would appear that the rules of the Milwaukee County Clearing House Association urged by Marine comport with these principles. Because of the tremendous volume of checks being handled, the rule recognizes that the payor bank needs a grace period following the computer phase to make the determination to pay or not to pay. Recognition of the viability of such a rule effectuates the purpose of the Code as expressed in comment to the 1962 Official Text of Art. 4, *Bank Deposits and Collections,* Uniform Commercial Code, at page 361, where it was stated that one of the goals of the Code was to provide "for flexibility to meet the needs of the large volume handled and the changing needs and conditions that are bound to come with the years."

676

We conclude that the order of the trial court denying the appellant's motion for summary judgment must be affirmed.

*By the Court.*—Order affirmed.