**NORTH CAROLINA NATIONAL BANK, Plaintiff,**

v.

**SOUTH CAROLINA NATIONAL BANK, Defendant.**

Civ. A. No. 75–1815.

United States District Court,
D. South Carolina,
Greenville Division.

Oct. 26, 1976.

R. Frank Plaxco, Greenville, S. C., for plaintiff.

F. Dean Rainey, Jr., Greenville, S. C., for defendant.

### ORDER

CHAPMAN, District Judge.

This is an action to determine the accountability of the defendant, South Carolina National Bank (SCN), to the plaintiff, North Carolina National Bank (NCNB), for the full amount of a $160,000 check under the provisions of the Uniform Commercial Code (UCC). It was tried before the Court without a jury on September 9, 1976.

NCNB contends that SCN made final payment of the item under the provisions of § 10.4–213 of the South Carolina Code of Laws 1962[1] and that it retained the check beyond the "midnight deadline" and is therefore accountable to it under the provisions of § 10.4–302.

Defendant answered alleging that the plaintiff breached its presentment warranty when presenting the check for collection in that it did not have "good title to the item or the authorization to obtain payment or acceptance on behalf of one who has good

title" under § 10.4–207(1). The defendant also contends that its delay in returning the check is excusable because of circumstances beyond its control as provided for in § 10.4–108(2).

The Court has weighed the testimony and evidence presented at the trial, reviewed the exhibits introduced into evidence and studied the applicable law. In accordance with Rule 52, Federal Rules of Civil Procedure, the Court now makes the following

### FINDINGS OF FACT [2]

1. Summerset Group, Inc., the drawer of the check, Kenway Corporation, the payee, and Futren of St. Pete, Inc. were closely held corporations, the common management of which had been engaged, for at least one month prior to the presentment of the check in question, in a check "kiting" scheme between eight different checking accounts.[3]

2. On Monday, June 30, 1975, a check was deposited with NCNB by the Kenway Corporation which maintained a demand deposit account with NCNB. The check was made payable to Kenway Corporation, was dated June 30, 1975 and was drawn by Summerset Group, Inc. in the amount of $160,000 upon a demand deposit account which was maintained at SCN's Myrtle Beach branch office in the name of Summerset Group, Inc.

3. After processing by the depository bank, NCNB, it was forwarded through the Regional Check Processing Center of the Federal Reserve System in Columbia, South Carolina on June 30, 1975 for presentment to the payor bank, SCN.

4. The check was received by SCN in its central check processing department in Co-

---

1. The Uniform Commercial Code sections cited in this Order from the Code of Laws of South Carolina 1962 can be found in the Code of Laws of South Carolina 1976 (the effective date of which is July 1, 1977) by substituting 36–4 for the 10.4 used in all citations of the UCC.

2. The findings of fact made by the Court have, for the most part, their basis in the Stipulation of Facts filed by the parties with the Court on September 9, 1976.

3. Check "kiting" is a process where checks written on one account are continually covered with deposits of checks written on another account thereby creating positive *statement* balances and preventing overdrafts but resulting in a steadily increasing deficit in the *collected* balance in most of the accounts.

lumbia, South Carolina on Tuesday morning, July 1, 1975. It was sorted by the computer but the account on which it was drawn was not updated because there were not sufficient funds in the account to cover the check. It was "read" by the computer onto a report of insufficient funds (NSF) which is a computer print out of items for which there are not sufficient funds in the account of the drawer to cover the amount of the item. This check, together with the other NSF items, was pulled from the paid items and taken to the returns clerk with the NSF report and the NSF stamp was placed upon the check. The returns clerk then communicated with the Myrtle Beach branch office as to the disposition of the check. By approximately 7:00 p. m. on July 2, 1975, the returns clerk had the check, the NSF report, and the Exception Report which contained the printed instructions from the Myrtle Beach branch office instructing that the check be paid notwithstanding the fact that there were insufficient funds in the account at that time to pay the check. The check was then processed as an overdraft, and it was entered against the account of Summerset Group, Inc., drawer, on magnetic computer tape. On the morning of July 3, 1975, it was stamped paid and submitted to the check processing department. Subsequently, on Wednesday, July 9, 1975, seven days after SCN personnel had decided to pay the check, the paying clerk discovered that the check did not have the indorsement of the payee, Kenway Corporation. She telecopied this information to Myrtle Beach which advised that the check should be returned. The check was then returned to the corrections clerk, who prepared a bookkeeping credit, and the original debit was erased from the computer tape. It was then sent to the returns clerk, who prepared a return letter to the Federal Reserve Bank, and a phone call was then made to the Federal Reserve notifying it of the return. The check was then returned to NCNB.

5. NCNB received the check after its return on Friday, July 11, 1975, at which time its personnel placed the following stamp on the check "Credited to the account of the within named payee", and the check was again forwarded through the Regional Check Processing Center for delivery to SCN.

6. The check was delivered to SCN on Tuesday, July 14, 1975, at which time the SCN computer again produced a report that there were not sufficient funds in the account of Summerset Group, Inc. to pay the check. Upon the advice of SCN personnel in Myrtle Beach that the check should not be processed as an overdraft, it was returned on Wednesday, July 15, 1975.

7. A power failure at approximately 7:00 p. m. on Monday, June 30, 1975 rendered SCN's computer inoperable. Power was restored and the computer was again operable at 6:00 a. m. on Tuesday, July 1, 1975. SCN's operations center prepared and distributed a notice to its correspondent banks stating that "[t]hese circumstances beyond our control have caused a delay of 24 hours in presentment of our return items with regard to incoming cash letters received on June 30, and items exchanged in the Clearing House on June 30. In addition our outgoing Cash Letters which normally would have been mailed on June 30, were not mailed until July 1."

## CONCLUSIONS OF LAW

The Court has jurisdiction of this action under 28 U.S.C. § 1332 since there is diversity of citizenship of the parties and since the amount in controversy exceeds $10,000 exclusive of interest and costs.

The Uniform Commercial Code provides in § 4–213(1) [§ 10.4–213(1) of the South Carolina Code of Laws 1962] that final payment of an item by a payor bank occurs when the bank has

"(a) paid the item in cash; or

(b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or

(c) completed the process of posting the item to the indicated account of the

drawer, maker or other person to be charged therewith; or

(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.

Upon a final payment under subparagraphs (b), (c) or (d) the payor bank shall be accountable for the amount of the item."

NCNB asserts that final payment was made under this section relying primarily upon the "midnight deadline", subsection (d) of § 10.4–213(1) which is more clearly stated in § 10.4–302. That section provides that

"In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of § 10.4–207), a settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of (a) a demand item other than a documentary draft whether properly payable or not if the bank . . . does not pay or return the item or send notice of dishonor until after its midnight deadline . . ."

The "midnight deadline" with respect to a bank is "midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." § 10.4–104(1)(h). It is not disputed that SCN failed to return the check within its mid-

4. While seven days passed before SCN returned the check, three of those days were not "banking days" within the meaning of § 10.4–104(1)(c); Friday, July 4, 1975 was a holiday.

5. Section 10.4–108(2) provides that
   "Delay by a . . . payor bank beyond time limits prescribed or permitted by this act . . . is excused if caused by . . circumstances beyond the control of the bank provided it exercises such diligence as the circumstances require."
   SCN contends that the breakdown of the bookkeeping computer system is a "circumstance beyond the control of the bank" and, therefore, excuses its failure to act within the midnight deadline. That section, in addition, provides

night deadline. The check was received by SCN on the morning of July 1, 1975 so that its midnight deadline was midnight of July 2, 1975. SCN did not return the check until July 9, 1975, the fourth banking day after the expiration of the midnight deadline.[4]

SCN, however, contends, in addition to its defense that the computer breakdown caused the delay,[5] that NCNB breached its presentment warranty of good title under § 10.4–207(1)(a) by presenting a check for payment without the payee's indorsement either directly made by the payee or supplied by the depository bank in accordance with § 10.4–205. If NCNB did breach its presentment warranty, it would be a valid defense to the payor bank's failure to return the check or give notice of dishonor within its midnight deadline. § 10.4–302. This Court does not reach this issue, however, since the defendant made final payment by "completing the process of posting" and thus is "accountable for the amount of the item." § 10.4–213(1)(c).

Section 10.4–109 of the UCC defines the "process of posting" as

"the usual procedure followed by a payor bank in determining to pay an item and in recording the payment including one or more of the following or other steps as determined by the bank:

(a) verification of any signature;
(b) ascertaining that sufficient funds are available;
(c) affixing a 'paid' or other stamp;
(d) entering a charge or entry to a customer's account;

that a bank must "exercise such diligence as the circumstances require" before delay will be excused. Here the computer failure occurred prior to the receipt of the check in question by SCN. In fact, the computer was in operation by the time the check was received to the extent that it produced a report of insufficient funds in the account of Summerset Group, Inc. Even assuming that the computer failure had caused a delay of 24 hours in processing items as stated in the defendant's notice which was sent to its correspondent banks, a delay of four days is not "such diligence as the circumstances require" under the facts of this case. Section 10.4–108(2), therefore, does not provide a tenable defense.

(e) correcting or reversing an entry or erroneous action with respect to the item."

■ Here the computer determined that there were insufficient funds in the account and did not debit the account. Nevertheless the returns clerk for SCN examined the check and the NSF report, received advice to pay the item notwithstanding the lack of funds in the drawer's account, physically marked the check paid, and charged the customer's account creating an overdraft. At this time SCN had decided to pay the check and had recorded that decision. In fact, the testimony of SCN's Assistant Vice-President in charge of bookkeeping both at the trial and in her deposition, indicated that SCN could have and normally would have returned the check within its midnight deadline had the check been considered an item to be returned.[6]

■ Although reliance might be placed upon § 10.4–109(e) which provides for the correction or reversal of an erroneous entry,

it would be misplaced since the draftsman of Article 4 never intended that this subsection allow the undoing of the process of posting once it has been completed.[7] Rather, it was intended for those situations "in which the bank's computer automatically debited an account for a check that the bank did not intend to pay (as for example because it was NSF)." J. White and R. Summers, Uniform Commercial Code 535–36 (1972).[8] Given such a case a bank official will typically examine the print out, make the decision not to pay the check and reverse the entry on the next computer run. Here, the check was not automatically debited from Summerset Group's account, but was printed out as an NSF item. At that time, SCN personnel decided to pay the check notwithstanding its NSF status.

SCN had, therefore, made "final payment" of the check by completing the process of posting under the provisions of §§ 10.4–109 and 10.4–103 of the UCC and is thus "accountable for the amount of the item." § 10.4–213.

6. The deposition of Betty B. Moss, Assistant Vice President in charge of bookkeeping for SCN reflects that since SCN had decided to pay the check and since the priorities in terms of processing had been completed there was no problem in delaying its further processing:
A. She had it and she got finished with what she needed to do, but by the time we finished out at the Operations Center to get those items back to the Proof Department, they were closed out for the day. It went in the following morning's work. Because we were going to pay it, we found no problem with holding this.
Q. If you had decided to return it . . .
A. It would have gone out on the second.
Q. For whatever reason, it would have gone out, right?
A. Yes.
Q. Notwithstanding. your computer breakdown, you were capable of processing, right?
A. Yes.
Q. Because you decided not to, this no longer had a priority in terms of processing? Right?
A. Yes.
Q. What you were doing was breaking your neck to handle those that were subject to requirements for processing in your judgment, right?
A. Yes.
Q. The Check at that point in time had been looked at by Barbara Ferguson and had been looked at by Susan Dominick? Right?
A. Yes.
Q. So she sent it back for processing?

A. Yes.
Q. It was paid?
A. Yes.
Q. Was the stamp applied to the check that said "Paid"?
A. Yes, that is what that has to be on the later one. You can't very well read it on yours, and it won't show up on that first film, because that is intentional. This one should show it.
OFF THE RECORD
Q. So after Susan sent it back to Workflow and said, "Pay it", then it went back through and another stamp was applied by machine that indicated that the item was paid? Is that right?
A. Yes.
Q. And it was paid at that time?
A. Yes.
Deposition of Betty B. Moss at 35–36.

7. J. White and R. Summers, Uniform Commercial Code 535–36 (1972); Malcolm, Reflections on West Side Bank: A Draftsman's View, 18 Catholic U.L.Rev. 23 (1968).

8. One case has decided otherwise, West Side Bank v. Marine Nat'l Exh. Bank, 37 Wis.2d 661, 155 N.W.2d 587 (1968), but it has been the subject of much comment unanimously agreeing that the Court erroneously interpreted §§ 4–213 and 4–109. See J. White and R. Summers, Uniform Commercial Code 535 and n. 34 (1972).

Accordingly, the Clerk shall enter judgment in favor of the plaintiff North Carolina National Bank.

AND IT IS SO ORDERED.