COURT OF APPEALS
DECISION
DATED AND FILED

**November 4, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2021AP1359**
**2021AP1360**
**2021AP1361**
**STATE OF WISCONSIN**

Cir. Ct. Nos.  **2020TP8**
**2020TP9**
**2020TP10**

**IN COURT OF APPEALS
DISTRICT IV**

---

NO. **2021AP1359**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO M.J.,
A PERSON UNDER THE AGE OF 18:

JUNEAU COUNTY DEPARTMENT OF HUMAN SERVICES,

PETITIONER-RESPONDENT,

V.

B. J.,

RESPONDENT-APPELLANT.

---

NO. **2021AP1360**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO B.J.,
A PERSON UNDER THE AGE OF 18:

JUNEAU COUNTY DEPARTMENT OF HUMAN SERVICES,

PETITIONER-RESPONDENT,

V.

**B. J.,**

   **RESPONDENT-APPELLANT.**

---

**NO. 2021AP1361**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO G.J.,
A PERSON UNDER THE AGE OF 18:**

**JUNEAU COUNTY DEPARTMENT OF HUMAN SERVICES,**

   **PETITIONER-RESPONDENT,**

 **V.**

**B. J.,**

   **RESPONDENT-APPELLANT.**

---

APPEALS from orders of the circuit court for Juneau County: PAUL S. CURRAN, Judge. *Affirmed.*

¶1     NASHOLD, J.[1]  In these consolidated appeals, B.J. challenges the circuit court's entry of partial summary judgment in the grounds phase of a termination of parental rights (TPR) proceeding as to his three minor children, "Ben," "Mary," and "George."[2]   B.J. argues that summary judgment was inappropriate; he further argues that the circuit court erroneously exercised its

---

[1] These appeals are decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20).  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] Consistent with the policy expressed in WIS. STAT. RULE 809.86, I use pseudonyms to protect the privacy interests of the children.

discretion in not considering certain documents he sought to introduce in that proceeding.  I conclude that the Department set forth a prima facie case for summary judgment, that B.J. did not submit any admissible evidentiary materials setting forth facts in opposition to that motion, and that summary judgment was therefore appropriate.  I affirm.

## BACKGROUND

¶2      The following is undisputed for purposes of appeal.  Ben, Mary, and George were born, respectively, in March 2010, March 2011, and October 2012.  The children lived with B.J. and their mother in the same household until sometime in 2013.  Thereafter, and until their removal from the home, the children lived solely with B.J.

¶3      On October 26, 2016, following Mary's disclosure of sexual abuse by B.J., the children were removed from the home.  On October 31, 2016, B.J. was charged in Juneau County Case No. 2016CF202 with four counts:  exposing a child to harmful material, possession of THC, first-degree sexual assault of a child under the age of twelve, and incest with a child.  *See* WIS. STAT. §§ 948.11(2)(a), 961.41(3g)(e), 948.02(1)(b), 948.06(1).  The sexual assault of a child and incest charges were based on allegations that B.J. had sexual intercourse with Mary on or between October 2014 and October 2016, when she was between three and five years old.  B.J. has since been in custody or incarcerated and has had no contact with his children per court order.

¶4      In March 2017, the children were adjudged in need of protection or services (CHIPS) on grounds of neglect and because they were receiving inadequate care during B.J.'s incarceration.  *See* WIS. STAT. § 48.13(8), (10).

¶5 In August 2017, B.J. was charged in Juneau County Case No. 2017CF213 with fifteen counts: two counts of first-degree sexual assault of a child under the age of thirteen; three counts of sexual exploitation of a child, recording or displaying a child engaged in sexually explicit conduct; four counts of child enticement, exposure of sex organ; and six counts possession of child pornography. *See* WIS. STAT. §§ 948.02(1)(e), 948.05(1)(b), 948.07(3), 948.12(1m).

¶6 In October 2018, the circuit court held a plea hearing on a global plea agreement in three criminal cases: the two discussed above and a third case, unrelated to any issues in these appeals, in which B.J. pled no contest to second-degree sexual assault, use of force. In Case No. 2016CF202, B.J. pled no contest to the sexual assault of Mary. The court dismissed and read in the incest charge and a subsequently charged offense of possession of child pornography. *See* WIS. STAT. § 948.12(1m). In Case No. 2017CF213, B.J. pled no contest to both counts of child sexual assault and to three counts of possession of child pornography. The remaining counts were dismissed and read in. The record indicates that the two pled-to counts of sexual assault of a child did not involve B.J.'s children. The record does not indicate whether the three pled-to counts of possession of child pornography involved B.J.'s children.

¶7 In March 2019, the circuit court sentenced B.J. in the three criminal cases. In Case No. 2016CF202, B.J. received twenty-five years of initial confinement and ten years of extended supervision. In Case No. 2017CF213, B.J. received a total sentence of twenty-five years of initial confinement and ten years of extended supervision, consecutive to his sentence in Case No. 2016CF202.

4

¶8      In March 2020, the Department filed TPR petitions for the children, alleging grounds of failure to assume parental responsibility and commission of a felony against a child.  *See* WIS. STAT. § 48.415(6), (9m).  In November 2020, the Department filed the instant motion, seeking partial summary judgment in the parental unfitness phase, on the statutory ground of failure to assume parental responsibility.

¶9      As part of its motion, the Department submitted summary judgment materials asserting the facts discussed above, and further setting forth the following.  First, as reflected in the affidavit of Detective Ben Goehring, B.J. admitted to Goehring that he took pictures of Mary and Ben nude and "that the children would observe him as he watched pornographic movies 'lots of times.'" Goehring further attested that, as part of the investigation, he recovered "thousands of images of child pornography" from B.J.'s digital media.  Some of the videos and photographs depicted assaults of Mary.  In other videos, B.J. videotaped unnamed children undressing; his "biological children were also captured via video/audio of the camera" and "were identified as being present at the time of the video."

¶10     Goehring further attested to conversations with Ben, in which Ben disclosed the following:

> [B.J.] watched videos of sexual acts with [Mary] multiple times;
>
> [Ben] watched grown-up videos with naked people and sex multiple times after school;
>
> [Ben] believed that there were "bad" videos of [B.J.'s] and [George's] private parts;
>
> [B.J.] would sometimes take naked videos of the children on his phone;

5

[Ben] was not supposed to tell anyone about "private stuff," at the risk of being punished;

[B.J.] would spank [Ben] with a red snow shovel or a piece of wood from a tree.

¶11 Goehring also attested that, as part of the investigation, he visited B.J.'s residence the day after the children were removed. He described the residence as follows:

The residence was a fifth wheel camper, with a plywood enclosure on the entrance side of the camper. The addition had food storage, and a portable toilet. Much of the camper and addition were covered with a tarp. The tarp was used due to leaks in the camper's roof. Inside the camper, there was hardened grime on the floor, which was also littered with garbage and food remains. All three children slept on a pull-out sofa. The sofa was infested with fleas, and appeared to have small rodents living in the mattress. The sofa was covered in animal feces and urine stains.

¶12 In addition, Ben's therapist, Honey Sternberg, attested in her affidavit:

I have been treating [Ben] since August 2017, due to the trauma he experienced while living with his father, [B.J.].

[Ben] has disclosed that his father touched his buttocks and penis. He also made [Ben] touch other people's privates, including his sister [Mary's] private parts. If he did not comply, his father would beat him with a wooden sword.

[Ben] tried to protect his siblings, and even cooked for them. [Ben] continues to feel guilt because he failed to protect his siblings.

I have diagnosed [Ben], to a reasonable degree of medical certainty, with Post-Traumatic Stress Disorder, as a result of the trauma he endured while living with his father.

6

In the course of therapy, I have worked with [Ben] on a number of issues stemming from his living environment with his father. We worked through [Ben] hoarding food and not using toilet paper. At his father's home, [Ben] would be spanked for using too much toilet paper.

As a result of the trauma, [Ben] has been fearful, overvigilant, overprotective, and aggressive. We continue to work through these behaviors, although [Ben] has made progress in these areas.

¶13     The County also submitted the criminal complaint in Case No. 16CF202 (which formed the factual basis for B.J.'s plea to the count involving Mary), setting forth the following sworn allegations:

[Mary] disclosed that her father [B.J.] "does" her with his penis. [Mary] described the penis and that [B.J.] put it in both her mouth and genitals and that he had taught her the word "jizzes." [Mary] disclosed that her siblings [George] and [Ben] also had touched [B.J.'s] penis. [Mary] was afraid to talk about what had happened, stating she would get a spanking.

[Mary] disclosed that she had witnessed [B.J.] taking clothing off with other adults, and sometimes she plays with [B.J.] and other adults while naked. This "play" includes touching "boobies" and other body parts.

[Ben] was also interviewed by CPS. [Ben] disclosed that he knew [B.J.] watched "grown up things" with naked people and sex. [Ben] disclosed he had seen these videos multiple times after school. [Ben] disclosed that sometimes [B.J.] would take naked videos of them (the children) on his phone, and that he believed there were "bad video[s]" of private parts taken by [B.J.] of [George]. [Ben] was reluctant to talk because he wasn't supposed to tell about "private stuff." [Ben] did say spontaneously that the videos were "not sent to other people" but that he watched them with [B.J.].

Both children indicated these encounters occurred at home….

Detective Goehring interviewed [B.J.] who admitted that his children had observed him watching adult movies "lots of times." He stated they walk in on him

watching the videos before he can stop them. He said sometimes he "forgets" it is on and grabs the kids.

Detectives observed the residence where this occurred was a trailer, without doors to the area where [B.J.] would watch [the videos]. [B.J.] said the videos he watches … include "3 ways, BDSM, oral, anal, a little bit of everything." [B.J.] indicated that the children may have seen that video [sic].

[B.J.] stated that everyone at the residence was frequently nude, as they are "nudists."

[B.J.] said this included often sleeping nude together, and he had nude pictures and videos of [the three children] and that [George] grabbing [B.J.'s] penis was merely [George] being "curious."[3]

¶14 Finally, the Department pointed to excerpts of B.J.'s sentencing transcript, in which he expressed remorse and appeared to acknowledge that he had harmed his children. Specifically, B.J. stated,

I want to start by apologizing to my children for what I have put them through, for trusting in me to protect them from all the harm but, instead, causing harm to them. I am truly deeply sorry.

….

Evidently I have come to realize that I do have some problems that need to be addressed. I will be going

---

[3] B.J.'s counsel never objected to either the circuit court's or this court's relying on the children's statements set forth in the criminal complaint and the affidavits of Goehring and Sternberg. Courts must ensure that affidavits or other submissions in support of summary judgement are "made on personal knowledge … set[ting] forth such evidentiary facts as would be admissible in evidence." WIS. STAT. § 802.08(3). Nonetheless, it is also a basic tenet of trial procedure that trial courts do not address potential errors that are wholly unobjected to, and a basic tenet of appellate procedure that we do not review forfeited issues. *See* **West Side Bank v. Marine Nat'l Exch. Bank**, 37 Wis. 2d 661, 665-66, 155 N.W.2d 587 (1968) ("Had [an objection] been raised in the trial court and [appellant's] affidavits were then found insufficient, the appellant would have been entitled to renew its motion upon the submission of affidavits in compliance with the summary-judgment statute."). I therefore consider the children's statements set forth in this opinion.

8

to prison for some time, and while I am in prison I will eagerly seek help for my issues, go through treatments that are available to me. I will fight, overcome, and kill this monster that hides within me, this monster which caused all this pain, harm, broken trust, and, worse yet, shame, the shame onto me, the shame onto my family and onto my friends because of me. I have a great family, but something must have really went wrong with me obviously….

¶15 The Department filed its summary judgment motion on November 12, 2020. In his February 19, 2021 response, B.J. filed an unsigned affidavit[4] in which he purported to dispute some of these facts. Specifically, this document stated that: B.J. "educated, protected, supervised and financially supported" his children to the best of his ability, given that he "struggled financially"; that the children did not sleep on a urine-soaked, mouse-infested mattress; that he was innocent of the sexual assault of Mary and was "fighting [his] conviction in the Court of Appeals";[5] that he inquires about his children's well-being; that prison rules and a no-contact order prohibited visitation and contact, but that he desired such; and that he never hurt his children. B.J.'s counsel attached a letter to the court, stating, "The Affidavit is unsigned, but has been sent to my client for a signature…. Please accept the unsigned Affidavit until I can obtain a signed and notarized Affidavit."

¶16 B.J.'s counsel submitted a signed affidavit on March 4, 2021, the day before the summary judgment hearing, which contained some edits to the unsigned version. The circuit court disregarded the affidavit because it was

---

[4] For ease of reading, this opinion refers to this document as an "unsigned affidavit" although, as explained below, the document is not in fact an affidavit.

[5] A no-merit report was filed in that appeal, No. 2020AP517-CRNM, and a decision on the report is pending.

noncompliant with WIS. STAT. § 802.08(2), requiring that respondents file affidavits at least five days before the summary judgment hearing.

¶17    Following a hearing on March 5, 2021, the circuit court granted summary judgment based on the ground of failure to assume parental responsibility.  *See* WIS. STAT. § 48.415(6)(b).  In reaching this conclusion, the court noted that B.J. was convicted in October 2018 for the sexual assault of Mary and that he had been entirely absent from his children's lives since October 31, 2016, when he was arrested for that conduct.  The court noted that at the time of B.J.'s arrest, the children were ages six, five, and four, and that at the time of the hearing, they were ages eleven, almost ten, and eight.  Thus, for a large or the majority portion of each child's life, B.J. had not assumed any parental responsibility.  The court further considered that, as a practical matter, the nature of the felony and the length of sentence imposed meant that B.J. would likely have no contact with the children for the remainder of their childhood.  The court also noted the "hazardous living environment regarding the conditions of the home," demonstrating B.J.'s failure to assume parental responsibility even while the children were living with him.

¶18    B.J. brought a motion to reconsider, arguing that the circuit court should have considered as evidence B.J.'s unsigned affidavit and/or the untimely submitted affidavit.  B.J. further argued that the court erred in granting summary judgment based solely on B.J.'s incarcerated status.  The court denied the motion. In the same hearing, the court found that termination was in the best interest of the children.  The court entered orders terminating B.J.'s parental rights.  B.J. appeals.

10

## DISCUSSION

### I. Principles of Law and Standard of Review

¶19    This court reviews a grant of summary judgment de novo, while benefitting from the circuit court's analysis. *State v. Bobby G.*, 2007 WI 77, ¶36, 301 Wis. 2d 531, 734 N.W.2d 81.  Partial summary judgment may be appropriate in the grounds phase of a TPR case where the pleadings and evidentiary submissions establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  *See Steven V. v. Kelley H.*, 2004 WI 47, ¶6, 271 Wis. 2d 1, 678 N.W.2d 856; WIS. STAT. § 802.08(2).  It is the moving party's initial burden to show the absence of genuine issues of material fact, *Central Corp. v. Research Products Corp.*, 2004 WI 76, ¶19, 272 Wis. 2d 561, 681 N.W.2d 178, at which point the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," § 802.08(3).

¶20    A TPR proceeding involves "'the awesome authority of the State to destroy permanently all legal recognition of the parental relationship.'" *Steven V.*, 271 Wis. 2d 1, ¶21 (quoted source omitted).  Accordingly, due process requires that certain procedural protections be provided to the parent.  *See id.*, ¶23.  In Wisconsin, this involves a two-part statutory procedure.  *Id.*, ¶24.  In the first or "grounds" phase, the petitioner must prove by clear and convincing evidence that there exists one or more grounds for parental unfitness under WIS. STAT. § 48.415.  *Id.*, ¶¶24-25.  In the second or "dispositional" phase, the petitioner must prove that termination is in the best interest of the child.  *Id.*, ¶¶26-27.  It is at this second stage that the child's best interests become paramount.  *Id.*, ¶26.  These appeals concern the grounds phase only.

¶21 In the grounds phase, a parent does not have an absolute right to a jury trial, and parental unfitness may be determined on summary judgment. *Id.*, ¶¶33-34. In many cases, the determination of parental unfitness on fact-intensive grounds, including the statutory ground at issue here, "will require the resolution of factual disputes by a court or jury"; thus, summary judgment "will ordinarily be inappropriate." *Id.*, ¶36. Where legally appropriate, however, the entry of summary judgment is constitutionally permissible, with "[t]he propriety of summary judgment [on any ground] determined [on a] case-by-case" basis. *Id.*, ¶37 n.4; *see also id.*, ¶¶41, 44.

¶22 The asserted grounds for B.J.'s TPR was "failure to assume parental responsibility," "which shall be established by proving that the parent or the person or persons who may be the parent of the child have not had a substantial parental relationship with the child." WIS. STAT. § 48.415(6). This provision further states:

> In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support for the child ….

*Id.* This subsection "prescribes a totality-of-the-circumstances test," in which "the fact-finder should consider any support or care, or lack thereof, the parent provided the child throughout the child's entire life." *Tammy W-G. v. Jacob T.*, 2011 WI 30, ¶3, 333 Wis. 2d 273, 797 N.W.2d 854. "This analysis may include

the reasons why a parent was not caring for or supporting [the] child and exposure of the child to a hazardous living environment." *Id.*

¶23 "[A] parent's incarceration is not itself a sufficient basis to terminate parental rights." *Kenosha Cnty. DHS v. Jodie W.*, 2006 WI 93, ¶50, 293 Wis. 2d 530, 716 N.W.2d 845. On the other hand, as previously stated, a parent's incarceration is relevant to determining *why* he or she has "not had a substantial parental relationship with the child." *See* WIS. STAT. § 48.415(6); *see also Tammy W-G.*, 333 Wis. 2d 273, ¶32 ("[U]nder a totality-of-the-circumstances analysis, the fact-finder can and should consider the reasons why a parent has not supported or cared for her child"); *id.* ("[W]e cannot ignore the fact that any roadblock to establishing a relationship with [the child] caused by [the father's] arrest, bond, and conviction was produced by [the father's] own conduct.") (quoting *Ann M.M. v. Rob S.*, 176 Wis. 2d 673, 685, 500 N.W.2d 649 (1993) (first, third, and fourth alterations in original)).

## II. Application to B.J.'s Appeals

¶24 I first determine whether the Department set forth a prima facie case for summary judgment on the ground of failure to assume parental responsibility. I then consider whether the circuit court should have considered additional information that B.J. sought to introduce via affidavit in opposition to the motion. Finally, I consider whether the undisputed material facts establish that, as a matter of law, B.J. failed to assume parental responsibility. *See* WIS. STAT. § 48.415(6).

A. The Department set forth a prima facie case for summary judgment.

¶25 B.J. argues that the Department has not set forth a prima facie case for summary judgment. *See* WIS. STAT. § 802.08(2); *Universal Die & Stampings,*

*Inc. v. Justus*, 174 Wis. 2d 556, 560, 497 N.W.2d 797 (Ct. App. 1993) (moving party must make a prima facie case for summary judgment). This argument is unpersuasive. Even construing all reasonable inferences in favor of B.J., as I must, *see **Lambrecht v. Estate of Kaczmarczyk***, 2001 WI 25, ¶33, 241 Wis. 2d 804, 623 N.W.2d 751, I cannot conclude that a genuine issue of material fact exists as to whether B.J. assumed parental responsibility for his children. Setting aside B.J.'s parenting while not incarcerated, it is undisputed that he has been completely absent for a large or majority portion of each child's life, during that child's formative years. That is, as of the date of the summary judgment hearing, the children were eleven, nine, and eight years old, respectively, and had not seen or communicated with B.J. for four and one-half years. During this time period, B.J. has been unable to "exercise … significant responsibility for the daily supervision, education, protection and care of the child[ren]." *See* WIS. STAT. § 48.415(6)(b). It is also significant that this circumstance was caused by B.J.'s own crime of sexual assault against his child, who was between the ages of three and five at the time of the assaults. As a matter of law, then, B.J. has not had a "substantial parental relationship" during his incarceration. *See **id.***

¶26 The question then becomes whether, under the totality of the circumstances, including B.J.'s parenting *prior to* incarceration, B.J. exercised "significant responsibility for the daily supervision, education, protection and care," such that a reasonable fact-finder could have found that he assumed parental responsibility even given his subsequent absence from the children's lives. *See **Tammy W-G.***, 333 Wis. 2d 273, ¶¶3, 25 (italics removed). The evidence establishes that Mary was sexually abused over a number of years and that all three children were subjected to extremely hazardous conditions, including sexual encounters with B.J., exposure to pornography, inclusion in B.J.'s creation of

14

pornography, and having to sleep together on a single pull-out sofa, which was covered with feces and urine and infested with fleas and possibly rodents. B.J. himself admitted in his sentencing remarks that he had caused his children harm, pain and shame. B.J.'s conduct toward his children, and in particular his sexual assault of Mary, evidenced a lack of "concern for or interest in the … care or well-being" of the children. WIS. STAT. § 48.415(6). On this extreme set of facts, no reasonable fact-finder could conclude that B.J. "exercise[d] … significant responsibility for the daily … protection and care" of his children. ***Id.***

### B. The circuit court did not erroneously exercise its discretion in disregarding B.J.'s unsigned and untimely filed affidavits.

¶27    B.J. argues that the circuit court erroneously exercised its discretion at the March 5, 2021 summary judgment hearing by not considering either his February 19, 2021 unsigned affidavit or his March 4, 2021 untimely filed affidavit, both of which dispute portions of the Department's evidence.

¶28    With respect to the unsigned affidavit, the circuit court properly refused to consider this document because it was not, in fact, an "affidavit," and thus could not support B.J.'s summary judgment response under WIS. STAT. § 802.08(2). *See Affidavit*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("affidavit" is "[a] voluntary declaration of facts written down and sworn to by the declarant, usu. before an officer authorized to administer oaths."). Regarding the actual affidavit, the statute and our case law suggests that the circuit court was without the authority to consider it. *See* § 802.08(2) ("Unless earlier times are specified in the scheduling order … the adverse party *shall* serve opposing affidavits … at least 5 days before the time fixed for the hearing." (emphasis added)); ***David Christensen Trucking & Excavating, Inc. v. Mehdian***, 2006 WI

15

App 254, ¶20, 297 Wis. 2d 765, 726 N.W.2d 689 ("We conclude that filing opposing affidavits at least five days prior to the date of the hearing was mandatory and that, in the absence of an effort to enlarge time, the circuit court had no alternative but to consider only [the movant's] materials in determining whether to grant summary judgment."). I note B.J. did not bring a motion to enlarge time.

¶29 Even assuming, however, that the circuit court had the discretion to consider the untimely filed affidavit, B.J. has not shown that the circuit court erroneously exercised its discretion in declining to do so. The Department filed for summary judgment on November 12, 2020, with the motion to be heard on December 3, 2020. B.J.'s original attorney withdrew and new counsel was appointed on December 1, 2020. On December 3, 2020, the court rescheduled the summary judgment motion to March 5, 2021. Thus, as noted by the circuit court, B.J. had almost four months from the time the summary judgment motion was filed, and over three months from the time the hearing was rescheduled, to file his affidavit. Notably, however, B.J.'s unsigned affidavit was filed February 19, 2021, and the signed affidavit was filed the day before the hearing, sometime after business hours. The affidavit was not made available to the parties until the morning of the March 5 hearing, with the hearing scheduled for 10:00 a.m. B.J. never offered any explanation for the delay, beyond the fact of his incarceration.

¶30 On the hearing on B.J.'s motion to reconsider, the circuit court noted that B.J. had "plenty of time" to file the signed affidavit and that consideration of the untimely affidavit would be akin to "sandbagging" the Department with evidence it had no time to refute. Based on the facts of record, B.J. has not shown

that the court erroneously exercised its discretion in declining to accept the untimely filed affidavit.[6]

## C. The court properly granted summary judgment based on B.J.'s failure to assume parental responsibility.

¶31     Where the moving party sets forth a prima facie case for summary judgment, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *See* WIS. STAT. § 802.08(3).  B.J. failed to do so here, so I am left only with the Department's undisputed facts showing that, as a matter of law, B.J. failed to assume parental responsibility.  *See id.*  I conclude that the circuit court properly granted summary judgment, having determined that no reasonable fact-finder could conclude, under the totality of the circumstances, that B.J. had a substantial parental relationship with his children.  *See Tammy W-G.*, 333 Wis. 2d 273, ¶3.  Accordingly, I affirm.

---

[6] B.J. appears to argue that the circuit court should have considered the unsigned affidavit and/or the untimely affidavit under WIS. STAT. §§ 802.08(3) and 802.10(3)(h).  With respect to § 802.08(3), B.J. suggests that the court should have allowed him to supplement the unsigned affidavit with the signed affidavit under § 802.08(3), which provides that "the court may permit *affidavits* to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits."  (Emphasis added.)  He offers no argument as to why this language applies, given that his initial submission was not in fact an "affidavit" which could be supplemented under this statutory language.  Regarding § 802.10(3)(h), B.J. relies on language in that provision stating that the court may enter a scheduling order addressing the "appropriateness and timing of summary judgment adjudication under [§] 802.08."  Based on this language, B.J. argues that "[h]ere the circuit court could have applied such section to deem the March 4, 2021 timely as it related back to the February 19, 2021 submissions" and that the court "erred in not providing such equitable relief."  B.J. cites no authority for the suggestion that a scheduling order may override a statutory deadline.  Even if permissible, however, B.J. has not offered any developed argument as to how this provision in § 802.10(3)(h) establishes that the court erroneously exercised its discretion in declining to consider either the unsigned affidavit or the untimely affidavit.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.