**CATALINA YACHTS, Plaintiff,**

v.

**OLD COLONY BANK AND TRUST CO. OF MIDDLESEX COUNTY and Warren D. Johnson, Defendants.**

**Civ. A. No. 77–1157.**

United States District Court, D. Massachusetts.

Sept. 18, 1980.

John H. Henn, Thomas M. S. Hemnes, Foley, Hoag & Eliot, Boston, Mass., for plaintiff.

Hochberg & Schultz, P. C., Gordon N. Schultz, Boston, Mass., for defendants.

Carl K. King, Goldstein & Manello, Boston, Mass., for Warren D. Johnson.

## OPINION

CAFFREY, Chief Judge.

This is a civil action in which plaintiff seeks damages for various claims arising out of the sale of marine property and the handling of certain checks delivered in connection therewith. Plaintiff Catalina Yachts (Catalina) is incorporated and maintains its principal place of business in California and is engaged in the business of manufacturing and selling sailing vessels. Defendant Old Colony Bank and Trust Company of Middlesex County (Bank) is a Massachusetts trust company and maintains its principal place of business in Massachusetts. Defendant Warren D. Johnson is a resident of Massachusetts and President, Treasurer and a principal shareholder of Eastern Yachts, Inc. (Eastern), a Massachusetts corporation. Until approximately August of 1976, Eastern was engaged in the business of selling yachts, boats and related merchandise at retail. On or about August 26, 1976, Eastern executed an assignment for the benefit of creditors. Jurisdiction is based upon 28 U.S.C. § 1332.

This matter is before the Court for hearing on defendant Bank's motion for summary judgment on Counts III, IV, V, VI, and

VII[1] of plaintiff's amended complaint. Plaintiff Catalina has filed a cross–motion for summary judgment on Count IV.

The following facts are undisputed. Catalina shipped seven yachts to Eastern between June 3 and June 18, 1976. The yachts were shipped C.O.D. On June 15, 1976, Eastern accepted delivery of two of the yachts, and simultaneously paid for them with an uncertified corporate check, numbered 1675, in the amount of $22,764.65, drawn on its account with Bank. Delivery of the remaining five yachts was made on June 29, 1976. On that day Eastern wrote two more checks, numbered 1699 and 1706, for $21,158.88 and $25,418.67, respectively, also drawn on its account with Bank.

The yachts were sold by Eastern and the proceeds of their sale were deposited in Eastern's bank account pursuant to a security agreement between Eastern and Bank for the purchase of inventory. The proceeds from Eastern's sales of Catalina yachts, possibly together with proceeds from the sale of other inventory, were deposited in Eastern's bank account as a lump sum of $86,505.13. The statement of account reflects this deposit in the plus balance of account on July 12, 1976.

Checks 1675 and 1706 were deposited for collection by Catalina on July 8, 1976 in its account at the Independence Bank of Encino, California, and were received for collection by Federal Reserve Bank of Boston (Fed) on July 12, 1976.

An understanding of the claims of the parties to this dispute may be gained by briefly explaining the process, established by affidavits, for the collection of cash items presented to Bank for payment. Pursuant to an "Off–Premises Presentment Request" (Request) between Fed, First National Bank of Boston (First), and Bank, Bank employs the services of First, a member of the Federal Reserve System, to receive cash items of the Bank's customers which clear through Fed. Request is a collection agreement between Bank, Fed and the First, which establishes the method and time of presentment of cash items on Bank.

By that agreement, Fed upon completion of its processing functions delivers the respective cash items in a "Cash Letter" at its office to a messenger of the First who calls at Fed to receive the items. Fed obtains a signed receipt from the First' messenger, which receipt designates the several banking institutions whose cash items have been cleared through Fed and are to be processed by First, and the particular morning or afternoon cash letters received by the messenger.

Pursuant to an "Agreement for Gross Payment of Cash Letters by Non–Member Country Bank by Authority to Charge to Member Banks Reserve Account" (Settlement Agreement), Fed advises First and Bank that Fed has charged First's reserve account with Fed with the amount of the cash letter to be delivered to Bank. Upon Fed's notice to First and Bank, Bank automatically makes settlement on all cash items clearing through Fed by accepting a debit to Bank's account with First.

Pursuant to Request, presentment to Bank is made at the premises of First. As part of the correspondent bank relationship between First and Bank, established by Request and the Settlement Agreement, Bank utilizes the computer services of First to begin processing all cash items cleared through Fed and presented upon Bank for payment. Bank furnishes First with records of Bank's customers' accounts which are assimilated into First's computer system in order to post cash items to customers' accounts in daily settlements. All transactions by Bank regarding cash items, except Notices of Dishonor and Return, bear the date upon which items are sorted and coded by First.

Thereafter all items comprising the cash letter are made ready for delivery to Bank. According to affidavits of Bank and First, the cash letter is customarily received by Bank on the banking day following the day on which the cash items are processed at

1. Counts I and II solely concern the defendant Johnson. Count I claims fraud and deceit in issuing bad checks and Count II claims violation of Mass.Gen.Laws ch. 93A.

First's computer center. Upon physical receipt Bank performs the inspection and other verification steps used in determining whether to pay an item or reverse an item previously entered by First's computer at the commencement of the posting process.

In the instant case, on the morning of July 12, 1976, Mr. Charles Blakeney, who was employed by the First as a messenger, called upon and received from the Fed cash items drawn upon and/or payable at Bank. He then delivered the morning cash letter to the Check Collection Department of the First for further processing. Fed advised First and Bank that Fed had charged First's reserve account with the amount of the July 12 cash letter to be delivered to Bank. Bank then made settlement for the cash letter in accordance with the Settlement Agreement. Following receipt of the July 12 cash letter at First's computer center for sorting and coding, the account of Eastern was debited for the amount of checks 1675 and 1706 and these items, together with all other items comprising the cash letter, were made ready for delivery to Bank on the next banking day.

The cash items contained in the July 12 cash letter were received by Bank on July 13, 1976. Bank reviewed the checks upon receipt but determined that Eastern's balance disclosed insufficient funds. On July 14, 1976, Bank effected reversal of the debit charged by computer to Eastern's account and returned checks 1675 and 1706 to Fed with Notice of Dishonor for insufficient funds.

Check 1699 was received for collection by Fed on July 15, 1976. The check was received at First's computer center for sorting and coding on Friday, July 16, 1976. Bank made settlement in accordance with the Settlement Agreement. The account of Eastern was provisionally debited for the amount of check 1699 and it, together with all other items comprising the cash letter, was made ready for delivery to Bank on Monday morning, July 19, 1976.

Bank received check 1699 from First on the morning of July 19, 1976. Bank's examination of check 1699 and of Eastern's

account disclosed insufficient funds to pay the item. Bank returned check 1699 to Fed with Notice of Dishonor for insufficient funds on July 19, 1976.

The affidavit and deposition testimony of John P. DiIorio, President of Bank, disclose that Bank made a decision on July 12, 1976 to setoff funds in Eastern's account and to apply such funds to outstanding loans in accordance with the default provisions of several notes and security agreements. On the morning of July 12 notice of default and demand by 5:00 p. m. of that day was delivered in hand to Johnson at Eastern. At 5:00 p. m. on July 12, Bank defaulted Eastern, setoff the amount of the balance in Eastern's account and sent notice of those actions with Advice of Debit by certified mail. Since the setoff was made at 5:00 p. m., after Bank's three o'clock "cut–off" hour, the setoff was posted to Eastern's account during business hours on July 13, 1976.

Turning first to Count III, the gravamen of Catalina's complaint is that Bank made a decision to finally pay checks 1675, 1706, and 1699 and is therefore accountable for their amounts under section 4–213(1) of Mass.Gen.Laws ch. 106. Catalina opposes Bank's motion for summary judgment on Count III on the ground that genuine fact issues exist as to whether Bank finally paid checks 1675, 1706, and 1699 by completing the process of posting those items to Eastern's account.

Section 4–213(1) of Mass.Gen.Laws ch. 106, provides that a payor bank becomes accountable for the amount of an item when it has finally paid it. Final payment may occur when a payor bank completes the process of posting an item to the account of the drawer. Mass.Gen.Laws ch. 106, § 4–213(1)(c). Section 4–109 provides, in pertinent part, that "[t]he process of posting means the usual procedure followed by a payor bank in determining to pay an item and in recording the payment . . . ."

The affidavit and deposition testimony of Ivy Percocco, Vice–President and Treasurer of Bank, which is uncontradicted, outline the process of posting employed by the

Bank. The charging of accounts by computer at First is the first step of the usual procedure followed by Bank in the making of a determination to pay an item. Upon physical receipt of an item, Bank performs the remaining steps in making that determination. The Bank's usual posting procedure includes a decision whether to reverse a provisional debit.

Bank customarily receives items on the banking day following the computer recording. In the instant matter, Bank received for review checks 1675 and 1706 on July 13, 1976 and check 1699 on July 19, 1976, and thus could not have completed posting before those days. The provisional debits for these items were reversed by Bank on July 14, 1976, and July 19, 1976, respectively.

From the deposition testimony of Bank President DiIorio, it appears that Bank never made a decision to pay checks 1675, 1706 and 1699 at any time during their processing. The reason for this was that Bank had setoff all funds in the account of Eastern Yachts on July 12, 1976 prior to Bank's physical receipt of the checks.

Nevertheless, Catalina contends that a genuine fact issue exists whether Bank made a decision to pay checks 1675, 1706, and 1699, which decision it subsequently reversed when it returned the checks. Catalina argues that a trier of fact could infer from the evidence that Bank completed the process of posting and thereby became accountable. Catalina contends that "[e]vidence on which these inferences could be based includes the 'PROCESSED' stamp on check 1699 (suggesting that the process of posting check 1699 may have been completed even if it were not completed for checks 1675 and 1706), the fact that DiIorio had personally approved payments of many overdraft items drawn on Eastern's account with Old Colony, the fact that on July 12,

1976, when checks 1675 and 1706 were posted by the [First] computer to [Bank] account, the account showed an adequate balance to cover the checks, so that *no* overdraft notice with respect to those checks would have been sent to [Bank] by the [First], and the fact that [Bank] took an extra banking day to return checks 1675 and 1760 (suggesting that at least for those two checks, [Bank] did indeed change its mind the day after a final decision had been made)."

Rule 56(c) requires a party opposing summary judgment to establish existence of an issue of fact which is both genuine and material. "To be considered 'genuine' for Rule 56 purposes a material issue must be established by 'sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 54 (1976).

▰ I rule that the affidavits and deposition testimony submitted by Bank in support of summary judgment on Count III establish that there was no decision by Bank to pay checks 1675, 1706, and 1699, no completion of the posting process, and thus no final payment of those items in accordance with section 4–213(1) of Mass.Gen. Laws ch. 106. I further rule that the evidence relied on by Catalina does not establish the existence of a genuine fact issue for trial. While a "plaintiff is entitled to all favorable inferences, he is not entitled to build a case on the gossamer threads of whimsey, speculation and conjecture." *Manganaro v. DeLaval Separator Co.*, 309 F.2d 389, 393 (1st Cir. 1962). Therefore, I rule that summary judgment should be granted for Bank on Count III.[2]

---

2. In view of the above disposition of Count III, the Court does not reach, and expresses no opinion on, the separate legal issue raised by the parties' briefs, namely whether a bank may reverse a decision to make a final payment at any point up to the expiration of the midnight deadline. *Compare, H. Schultz & Sons, Inc. v. Bank of Suffolk County*, 439 F.Supp. 1137 (E.D.

N.Y.1977); *Community Bank v. United States National Bank of Oregon*, 276 Or. 471, 555 P.2d 435 (1976, *with West Side Bank v. Marine National Exchange Bank*, 37 Wis.2d 661, 155 N.W.2d 587 (1968). See also Note, "Bank Procedures and the U.C.C.–When is a Check Finally Paid?", 9 *Boston College Industrial and Commercial L.Rev.* 1957 (1968).

Turning next to Count IV, Catalina alleges in its complaint that Bank failed to return checks 1675 and 1706 within the time prescribed by law. Specifically, Catalina claims that these items were presented upon Bank for payment on July 12, 1976, and were required to be returned by Bank no later than midnight, July 13, 1976. Because Bank dishonored these items on July 14, 1976, Catalina contends that Bank became accountable for these items under Mass.Gen.Laws ch. 106, Section 4–302.

Bank does not dispute that the items were dishonored by it on July 14, 1976, but contends that its return of the items was timely made in accordance with Request which provides the time and manner for the return of unpaid items which have cleared through Fed and have been provisionally posted to Bank's customers' accounts by First.

Paragraph three of Request provides that with respect to unpaid items Bank will comply with Operating Letters 6 and 6A as if such cash items had been received by Bank "on the business day next following the actual day of delivery" of the cash items by Fed to First's messenger. Section 10 of Operating Letter 6 provides, in pertinent part, as follows: "Instructions pertaining to the handling of cash items by collecting banks and paying banks are set forth in ... Operating Letter No. 6B." Section 6 of Operating Letter 6B provides that a payor bank may return "an unpaid item in accordance with the provisions of Section 210.12 of Regulation J" which provides, in relevant part, that a payor bank shall have the right to recover payment made pursuant to § 210.9(a) "if, before it has finally paid the item, it returns the item before midnight of its banking day next following the banking day of receipt or takes such other action to recover such payment or remittance within such time and by such means as may be provided by applicable state law ...." Regulation J fixes the time for return of an unpaid cash item, provided that the time for return not be extended by any special collection agreement. 12 C.F.R. § 210.12(a). The time for return commences to run from "the banking day of receipt."

The applicable state law also computes the time for return of an unpaid item from the day of receipt. Mass.Gen.Laws ch. 106, § 4–104(h) provides that the midnight deadline is "midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later."

Plaintiff claims that Request impermissibly extends Bank's midnight deadline in violation of Regulation J, § 210.12(a) by altering the time of receipt. Plaintiff's position appears to be that presentment is receipt, and consequently, since presentment occurred at First, pursuant to Request, on July 12, receipt also occurred on July 12. Doubtless in the absence of an off–premises presentment agreement, presentment would ordinarily occur when a cash item is physically received by payor bank for acceptance or payment. However, where presentment occurs off premises, plaintiff's position appears to raise a question of first impression, and, consequently, I rule that another course is permissible.

Neither Regulation J nor the Uniform Commercial Code as adopted by Massachusetts use the terms presentment and receipt interchangeably. *Compare* 12 C.F.R. § 210.8 (Presentment of non–cash items for acceptance) *with* § 210.12 (Return of cash items); *compare* Mass.Gen.Laws ch. 106, § 3–504 (How presentment made) *with* §§ 4–301(1)(a), 4–104(h) (Return of items). In addition, Section 4–107, Mass.Gen.Laws ch. 106, provides, in whole:

*Time of Receipt of Items*

(1) For the purpose of allowing time to process items, prove balances and make the necessary entries of its books to determine its position for the day, a bank may fix an afternoon hour of 2 P.M. or later as a cut–off hour for the handling of money and items and the making of entries on its books.

(2) Any item or deposit of money received on any day after a cut–off hour so fixed or after the close of the banking day may be treated as being received at the opening of the next banking day.

*See also* 12 C.F.R. § 210.9 n.4, providing similarly.

When presentment is made off–premises a payor bank does not have actual possession and thus cannot determine whether to make or refuse the acceptance or payment. The ability to make this determination appears to be an important consideration under the U.C.C. *See, e. g.,* Mass.Gen.Laws ch. 106, §§ 4–107(1), 3–504(3)(b). Presentment at First does not amount to receipt by Bank as Bank does not have actual possession and as First does not have the ability or authority to make a decision to pay for Bank. First merely performs the mechanical task of posting cash items presented for payment by Bank. Bank makes the determination to pay or not to pay when it physically receives the item. Request recognizes this situation and establishes that the time of receipt by the payor of cash items, which are picked up at the office of the Fed by the First, is "the business day next following the actual day of delivery" of the cash items to the First. Thus, Request defines receipt as the time when Bank physically receives the item. At that point the midnight deadline begins to run giving Bank a reasonable time, as contemplated by the U.C.C., to inspect its account and to determine whether the depositor has sufficient funds to warrant payment. *Contra, Capital City First National Bank v. Lewis State Bank,* Fla.App., 341 So.2d 1025, 1036 (1977). (Payor bank "having failed to dishonor the Commonwealth [Corporation] checks within the time allowed after presentment, its attempt thereafter to dishonor was ineffective . . . ." I rule that case is distinguishable from the present one in that *Capital City's* clearinghouse arrangement did not provide the time and manner for the return of unpaid items.)

■ Request's provision that receipt occurs when the Bank has actual receipt does not conflict with Regulation J's provision that an unpaid cash item may be returned "before midnight of its banking day next following the banking day of receipt" provided that the time for return not be extended by any special collection agreement.

Mere definition of what action constitutes receipt is not inconsistent with Regulation J or the applicable state laws which fix the time for return of items as commencing to run from the time of receipt. These laws neither define as nor equate receipt with presentment. Moreover, it would appear that agreements such as Request are the kind of agreements contemplated by Mass. Gen.Laws ch. 106, § 4–103, which authorizes agreements altering the provisions of the U.C.C. *Berman v. United States National Bank,* 197 Neb. 268, 249 N.W.2d 187, 199 (1976). *Compare West Side Bank v. Marine National Exchange Bank,* 37 Wis.2d 661, 155 N.W.2d 587, 594 (1968).

In the present dispute, the day of delivery to First of the relevant cash items was July 12, 1976. In accordance with Request, and in actuality, Bank received checks 1675 and 1706 on the next banking day, July 13. Thus, the time for taking action commenced to run on July 13 and Bank's midnight deadline was the next banking day, July 14. There is no dispute that the cash items received were returned before this deadline since the parties agree that the items were returned on July 14. Accordingly, Bank's return of unpaid items before its midnight deadline, July 14, was timely in accordance with Mass.Gen.Laws ch. 106, § 4–301(1).

Catalina has predicated its claim in Count IV solely on its legal contention that the midnight deadline was July 13. It argues that since Bank did not return the items by that date, Bank is deemed to have finally paid those items by reason of its late return. Since there are no genuine issues of material fact and since Bank's return of the items was timely in accordance with its midnight deadline, it follows that summary judgment for Bank on Count IV should be allowed and that summary judgment for Catalina on Count IV should be denied. It should be noted that since check 1699 was returned on the day it was received by Bank, well within its midnight deadline, and Bank never decided to pay that item, as established by the uncontradicted affidavit of Percocco, there is no dispute as to that item.

In Count V of its amended complaint, Catalina seeks to recover damages based on several alleged misrepresentations made by Bank concerning the financial status of Eastern and concerning Bank's plans to off-set against Eastern's account the indebtedness of Eastern to Bank under the terms of their security agreement. Specifically, Catalina alleges that under the terms of the existing security agreement between Eastern and Bank, Bank possessed a security interest in all of Eastern's then–present and after–acquired inventory, and that Bank also acquired the right to offset against Eastern's account any indebtedness of Eastern if Eastern became in default or "out of trust" under the security agreement. Catalina states that beginning sometime prior to June 22, 1976, and continuing until July 14, 1976, the indebtedness of Eastern stood in excess of $150,000, thereby placing Eastern in default or "out of trust." Catalina further alleges that, on June 24, 1976, Mr. Wilbur Pokras, the sales representative of Catalina having charge of sales to Eastern, called Bank to determine whether there were sufficient funds in Eastern's checking account to cover check 1675. As noted above, check 1675 was issued by Eastern on June 15, 1976 in the amount of $22,764.45 upon delivery of two yachts to Eastern. Catalina alleges that Mr. Pokras was informed by defendant that there were sufficient funds on account to cover the check, when in fact Eastern's account was overdrawn.

Mr. Pokras allegedly called Bank again on July 9, 1976, to determine whether there were sufficient funds to cover checks 1699 and 1706, and was informed that there was "plenty of money" in the account or that there was "no problem," or words to that effect, when in fact Eastern's account was overdrawn. As noted above, checks 1699 and 1706 were issued by Eastern on June 29, 1976, in the amounts of $21,158.88 and $25,418.67, respectively, upon delivery of five yachts.

Catalina contends that by stating that there were sufficient funds in Eastern's account to cover the checks issued, when in fact Eastern was overdrawn, and by concealing the fact that it could, at any time, exercise a right of set–off against Eastern's account, Bank misrepresented material facts with the intention of inducing Catalina to take no steps to recover yachts which had been or were to be delivered to Eastern, thus increasing the collateral securing Eastern's indebtedness. In fact, the proceeds from the sale of these yachts, deposited in Eastern's account on July 12, 1976, allowed Bank to set–off loan indebtedness that same day in the amount of $73,390.47, resulting in the dishonor of the checks 1675 and 1706 on July 14, 1976, and check 1699 on July 19, 1976. Plaintiff contends that in reliance on defendant's misrepresentations, it took no steps to recover the yachts, and seeks damages in the amount of $69,341.00, the combined value of the yachts.

At his deposition, Mr. Pokras testified that when he called Bank on July 24, 1976, he was informed that there were deposits coming into Eastern's account and that none of its checks had ever been dishonored by the Bank. There was no mention of an overdraft. Mr. Pokras further testified that when he called on July 9, 1976, he spoke with the same person, and was told, "the account has not changed. We have not returned any items, and there is a lot of money coming into the account." Although the Bank representative refused to reveal the account balance, Mr. Pokras was again informed that the Bank "had not returned a check" of Eastern's.

The account statements of Eastern indicate that on the two occasions when Mr. Pokras called Bank, Eastern was in fact overdrawn, and had been continuously overdrawn since June 22, 1976.

In its motion for summary judgment on Count V, Bank first argues that, as a matter of law, Catalina has no claim against Bank for deceit. Bank states that even assuming that Mr. Pokras' deposition testimony concerning his two conversations with Bank is true, there was no misrepresentation. Bank points out that its representative never told Mr. Pokras that "there was

plenty of money in the account," as alleged in the complaint, and, in fact, expressly refused to give Mr. Pokras the balance of Eastern's account. The representative simply indicated that there were deposits being made to the account and that Bank had never returned any of Eastern's checks, both of which were true. Bank therefore contends that Catalina's loss was merely caused by Mr. Pokras' inaccurate interpretation of the statements made. Furthermore, Bank argues that Bank was under no obligation to disclose the financial condition of Eastern or the Bank's own financial plans, citing for this proposition the case of *Levitz Furniture Co. v. Citizens & Southern National Bank*, 147 Ga.App. 295, 248 S.E.2d 557 (1978).

In opposition, Catalina argues that Bank chose only to disclose information which would lead Mr. Pokras to believe there was no problem, as indicated by Bank's casual response on June 24, 1976 that there were deposits coming into the Eastern account and that none of its checks had been dishonored, and by its response on July 9, 1976 that the account "has not changed" and "a lot of money" was coming in. "Nothing was said about the large overdraft, about the fact that Old Colony had been paying Eastern's checks despite insufficient funds, about Eastern's out-of-trust situation, or about Old Colony's increasing concern and involvement with Eastern's indebtedness." Catalina argues that it would have been difficult to respond in a more misleading manner and cites *Kannavos v. Annino*, 356 Mass. 42, 247 N.E.2d 708 (1969), for the proposition that half-truths are actionable misrepresentations. Although Catalina concedes that it would have no claim against Bank had it refused to disclose any information about Eastern, it contends that Bank's selective disclosure was misleading.

■ After considering the above arguments and the documents submitted in support thereof, I rule that a genuine fact issue regarding the Bank's fraudulent conduct exists for trial. While a Bank may have no duty in the abstract to disclose financial information about its customers, it may not engage in selective disclosure designed to misrepresent the financial status of its customer. *See* Restatement (Second) of Torts § 529 & Comment a. To the extent the *Levitz* case cited by Bank holds to the contrary, this Court chooses not to follow it. Whether the two communications between Mr. Pokras and Bank, when considered together with the surrounding circumstances, were misleading, were intended by the Bank to be so, and were reasonably relied upon by Catalina are questions as to which genuine fact issues exist and they are, therefore, for the trier of fact.

■ The Bank makes a second argument in support of its motion for summary judgment on Count V. Bank argues that, as to the first two yachts delivered on June 15, 1979, the Bank's security interest had already attached by the time of Mr. Pokras' first contact with Bank on June 24, 1976. Bank contends that its security agreement with Eastern gave it the status of a good faith purchaser under section 2–403 of Mass.Gen.Laws ch. 106, and, as such, its interest in the delivered yachts was superior to the unpaid and unsecured cash seller of the goods. Thus, Bank contends Catalina lost its right to reclaim the first two yachts delivered on June 15 and therefore suffered no legal detriment from the alleged misrepresentations on June 24, 1976.

The status of Bank's security interest as an interest superior to plaintiff's right as an unpaid cash seller to reclaim its goods depends, in turn, on Bank's status as a "good faith purchaser." *See In re Samuels & Co.*, 526 F.2d 1238 (5th Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976). "Good faith" is defined by the U.C.C. as "honesty in fact in the conduct or transaction concerned." Mass.Gen.Laws ch. 106, § 1–201(19). Mindful that "[s]tate of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind," *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 54 (1976), I am not convinced, after reviewing the documents submitted by Bank, that no genuine fact

issues exist regarding the Bank's good faith. Therefore summary judgment for Bank on Count V should be denied.

One final matter needs consideration with regard to Count V, in view of the First Circuit's recent decision in *Szabo v. Vinton Motors, Inc.,* 630 F.2d 1 (1st Cir. 1980). Bank argued in earlier briefs that plaintiff could show no legal detriment from the alleged misrepresentations since the ten–day period for exercising its right of reclamation under section 2–507(2) of Mass.Gen.Laws ch. 106 expired before Catalina could have presented the checks and received notice of dishonor.

■ Although section 2–507(2) does not expressly grant to a cash seller the right to reclaim goods, such a right is inherent in sections 2–507(2) and 2–511(3). *Szabo, supra,* slip op. at p. 3. In order to exercise this reclamation right, the cash seller must make a demand for return of the goods within ten days of when the buyer receives them. *Id.* at pp. 3, 4. Failing to do so, a cash seller waives the right to reclaim.

In the instant dispute, it is clear that Catalina was a cash seller. The uncontroverted facts establish that the yachts were shipped C.O.D.; that in the ordinary course of dealings between Catalina and Eastern goods were usually shipped C.O.D., cashier's check; and that the pertinent instruments were dated, signed and tendered by Eastern and accepted by Catalina on the day of delivery rendering plaintiff a cash seller. Thus, its actions were governed by section 2–507.

■ Any claim by Catalina that a cash seller may exercise his right to reclaim goods without presenting the check if he learns within the ten days of the buyer's insolvency is meritless. It is true that a credit seller who learns of a buyer's insolvency may make a demand for the return of the goods within ten days of delivery. Mass.Gen.Laws ch. 106, § 2–702(2). Nevertheless, a cash seller's right to reclaim is governed by sections 2–507(2) and 2–511(3), not section 2–702(2). And, under section 2–511(3), "payment by check is conditional and is defeated as between the parties *by dishonor of the check on due presentment."* (emphasis supplied). *See also Kirby v. Bergfield,* 186 Neb. 242, 182 N.W.2d 205 (1970). Furthermore, a rule requiring cash sellers to first present the buyer's check for payment before exercising their right to reclaim will encourage them to proceed with due diligence. *See Szabo, supra,* slip op. at p. 4.

■ In the case at hand, Catalina received check 1675 on June 15, 1976. On June 24, 1976, the date of Mr. Pokras' first conversation with Bank, only one day remained for Catalina to present the check for payment and to make a demand on Eastern for return of the two yachts upon dishonor. It is highly improbable, and Catalina does not claim, that the one remaining day was a sufficient amount of time to comply with the requirements of section 2–507(2) and 2–511(3). Therefore, even assuming that the representations made to Mr. Pokras by Bank on June 24 constitute actionable deceit, plaintiff could have suffered no legal detriment. Its right to reclaim the two yachts had, for all practical purposes, already lapsed. The same is not true of checks 1706 and 1699 since they were received by Catalina on June 29, 1976, well after Catalina's first contract with Bank. Thus, summary judgment should enter for defendant Bank on Count V only to the extent that plaintiff seeks to recover damages for the two yachts covered by check 1675.

In Count VI of its amended complaint, Catalina alleges that Bank engaged in a fraudulent scheme which resulted in its own enrichment at Catalina's expense. Catalina describes its theory of recovery thusly:

> The gravamen of Catalina's claim is that Old Colony pursued a course of conduct—the payment against insufficient funds of small checks primarily to trade creditors—which resulted in a misrepresentation to the world that Eastern was an on–going business paying its debts as they arose,

when in fact Eastern was not. The foreseeable, proximate, and predictable consequence of this misrepresentation was that Eastern's doors remained open *and* that Eastern's largest trade creditor, Catalina, continued to deliver yachts, and did not reclaim the yachts already delivered. These yachts were forseeably and predictably converted into deposits to Eastern's account (the yachts having previously been ordered by Eastern retail customers), prior to the time that Catalina presented Eastern's company checks (which Old Colony knew Eastern had issued for the yachts) for payment at Old Colony. Count VI is thus a claim for knowing deceit. It is not a claim that Old Colony should have disclosed any information about Eastern to Catalina, but only a claim that Old Colony should not have engaged in a course of conduct designed to misrepresent Eastern's financial condition.

Catalina also stresses that, by June of 1976, Bank had assumed almost complete control of Eastern's operations because of Eastern's precarious financial condition. Furthermore, Catalina argues that Bank had everything to gain by keeping Eastern afloat long enough for it to procure and sell more inventory, the proceeds of which would be deposited in Eastern's account and thereby subject to setoff.

■ Plaintiff cites no caselaw in support of its novel theory of recovery. In essence, plaintiff is attempting to recover damages based on Bank's fraudulent maintenance of Eastern's shaky financial position, regardless whether Bank made written or oral misrepresentations to Catalina. I decline to recognize such an openended and potentially unlimited theory of recovery. To the extent, then, that plaintiff attempts in Count VI to state a claim for deceit broader than that already stated in Count V, I rule that it has failed to state a claim upon which relief may be granted.

■ Plaintiff makes an alternative argument in support of its claim in Count VI

to wit, that: even assuming Bank's conduct did not amount to knowing deceit, nevertheless Bank was unjustly enriched at Catalina's expense and, under the analysis set forth in *Superior Glass Co. v. First Bristol County National Bank,* —— Mass. ——, 1980 Mass.Adv.Sh. 1419, 406 N.E.2d 672, Catalina should recover the value of the yachts. I rule that the *Superior Glass* case is distinguishable from the instant case, since there the Supreme Judicial Court dealt with the situation where a bank in its status as the owner of a construction project placed its claims as a prior lender to the contractor ahead of the "peculiarly equitable claims of the subcontractor plaintiffs, . . . ." *Id.,* at ——, 1980 Mass.Adv.Sh. at 1424, 406 N.E.2d at 675. The claims of the unpaid cash seller, Catalina, are distinguishable from those of the unpaid subcontractors in *Superior Glass,* as they are governed not by equitable notions but by the strictures of the Uniform Commercial Code. Therefore, I rule that plaintiff has failed to state a claim based in Count VI on the theory of unjust enrichment.

■ The last matter to be considered is Bank's motion for summary judgment as to Count VII of plaintiff's amended complaint. For reasons best known to it, Bank has not briefed so much of the motion as attacks Count VII and, consequently, has failed to make clear that there is no issue of material fact as to the allegations contained in Count VII. This mandates the denial of so much of the motion as refers to Count VII.

Order accordingly.